Hill, J.:
This is an appeal by Murray & Sons Construction Company of the trial court’s holding that it had breached an implied-in-fact contract with Lindsey Masonry Company by not paying for all of die services performed. Along with the contract payments, the trial court awarded interest, costs, and attorney fees as authorized by the Kansas Fairness in Public Construction Contracts Act. Our review of the extensive record leads us to conclude that we must affirm the judgments of the trial court.

With no signed contracts, a general contractor and a masonry company work together on several public school projects.

The Blue Valley School District decided to build four buildings: the Blue Valley Elementary School #22, die . New Highlands Elementary School, Blue Valley Southwest High School Sports Field Buildout, and Blue Valley Middle School #10. Over a span of several months, the school district sought and received separate bids on each project. Murray & Sons bid on the projects as the general contractor and asked Lindsey Masomy to submit bids on the projects for the masonry work (labor only).
Blue Valley picked Murray as the general contractor on each of these projects and Lindsey became Murrays masonry subcontractor for all four buildings. A pattern of business then developed between the two companies as the work progressed. For each building project, Lindsey submitted to Murray a written proposal that *507 included the names of the parties, the identification of the project, the price, the scope of work, exclusions from the scope of work, and the identification of the plans, specifications, and drawings that applied to each.
Each of Lindseys proposals indicated that the parties would later sign an AIA Document A-401 Standard Form Agreement between Contractor and Sub-Contractor. (This form is supplied by The American Institute of Architects.) The proposals also contained language regarding the timing of payments and listed the percentage of retainage to be withheld.
After that, Murray would include the price from each of Lind-seys proposals in its bids to Blue Valley.
After Murray was awarded the contract on each project, it asked Lindsey to be the masonry subcontractor. Lindsey then sent Murray a schedule of values for each project. The schedule of values, essentially, is a price list that sets out each masonry task to be performed. Lindsey used the schedule of values when it prepared its pay applications to Murray and, in turn, Murray used the same schedule of values when it prepared its pay applications to Blue Valley.
After each successful bid on each project, Lindsey signed and sent an AIA form subcontract to Murray to sign. In return, Murray sent a signed AGC subcontract form to Lindsey for its signature. (This is a contract form supplied by the Associated General Contractors of Kansas, Inc.) Neither party signed the form contracts sent by the other company. As far as we can tell from this record, no written agreements were ever signed by both parties, except for some specific change orders signed in the midst of construction.
Nevertheless, Murray authorized Lindsey to begin work on each project and Lindsey did so. Lindsey periodically submitted pay applications to Murray and received periodic payments from Murray. As the buildings progressed, Murray submitted pay applications to the owner and received payments from Blue Valley. After payment, Lindsey would return partial hen waivers that reflected the amount of the payment.
Unfortunately, the working relationship between Murray and Lindsey deteriorated, and Lindsey walked off the Blue Valley #10 *508 job before completing the masonry work. Later, Lindsey filed a lawsuit seeking money from Murray. In its lawsuit, Lindsey claimed damages for money due on each of the projects, asserting alternative theories of recovery based on breach of contract, promissory estoppel, and quantum meruit. Murray denied liability and asserted counterclaims against Lindsey on each project.

The parties submitted the case to the judge.

At trial, both Lindsey and Murray agreed about the identity of the parties, the scope of work, and the original price, as modified by the fully executed change orders for each project. They did not agree on anything else.
In the end, the trial court found that the evidence failed to establish an express contract between the two companies. Instead, the court concluded that there was an implied-in-fact contract on each project for Lindsey to perform the masonry work described in the scope of work in exchange for the compensation set out in Lindseys proposal and schedule of values. The implied-in-fact contract contained no specific time for payment. The court made specific findings about each project. We list a brief summary of each.
Blue Valley #22
On the Blue Valley #22 project, the district court found that the parties agreed to a revised total compensation of $1,036,848 for the masonry work. Lindsey completed all of its work on the project, but received only $1,020,568 from Murray. The court found Murray in breach of contract for its failure to pay Lindsey the remaining balance of $15,916 and granted judgment in that amount.
The court denied Murrays counterclaim for $5,511 for the cost to repair a damaged portion of a roof. The court found that the parties’ conduct established an agreement that any changes in the work would be made by written change orders signed by both parties. Since Murray had submitted a change order for the roof repair and Lindsey had not signed it, Lindsey was not liable under the counterclaim. The district court awarded Lindsey interest, costs, and attorney fees under the Kansas Fairness in Public Construction Contract Act found at K.S.A. 16-1901 et seq. (not to be *509 confused with the Kansas Fairness in Private Construction Contract Act found at K.S.A. 16-1801 et seq.)
New Highlands
On the New Highlands project, the district court found that the parties agreed to a revised total compensation of $1,014,358. Lindsey completed its work, but $83,794 remained unpaid. The district court found Murray in breach of contract for failure to pay that amount.
The district court found Lindsey in breach of contract for not installing some steel rebar in the storm shelter walls on that project. Murray was entitled to recover $55,250 from Lindsey to remediate the rebar omission. In addition, Murray was entitled to recover $5,957 in damages to remediate some subsequent damage to the water proofing and a protection board.
The court set off Murrays damages against Lindsey’s damages, resulting in a net judgment of $22,587 awarded to Lindsey. In addition, the court awarded Lindsey interest, costs, and attorney fees under tire Act.
Sports Field Buildout
On the Sports Field Buildout project, the district court found that the parties agreed to a price of $123,590. The court found that $12,565 remained due to Lindsey and awarded judgment in that amount plus interest, costs, and attorney fees under the Act. The court denied Murrays counterclaim for $4,166 in damages for weather-related time extensions.
Blue Valley #10
While this project was in progress, the parties’ relationship ruptured. On the Blue Valley #10 project, the district court found that the parties agreed to a revised price of $1,727,922. On October 27, 2010, Lindsey stopped work on the project and walked off the job when the masonry work was 65 percent complete.
The court found that Lindsey stopped work because Murray repeatedly stated to Lindsey that it was not going to pay Lindsey. The court also found that Murray’s act of shutting off tire water and *510 removing the water meter meant that Lindsey could no longer mix mortar to do the masomy work.
On this project, Murray did not pay Lindsey on its pay applications for work done in August, September, and October 2010. Those applications total $490,188.72. The court found that Lindsey was not responsible for damages that Murray incurred when Lindsey walked off the job because the expenses were actually due to Murrays breach. Murray was, however, entitled to $55,998 for indemnification of expenses incurred when the project was shut down temporarily due to an accident involving a Lindsey employee. The district court set off the $55,998 against the $490,118.72 for a net judgment of $424,190.72 awarded to Lindsey. The district court also awarded Lindsey interest, costs, and attorney fees under the Act.
Murray raises five issues in this appeal. The general contractor contends:
First, by beginning work, Lindsey accepted Murrays AGC form contract. It refers to this as acceptance by performance.
Second, the court erred by refusing evidence that the two companies agreed to many tilings on the Blue Valley #10 project.
Third, the Kansas Fairness in Public Construction Contracts Act is inapplicable to implied-in-fact contracts.
Fourth, the court erred by not considering alternative equitable theories of recovery.
Fifth, the courts findings are not supported by substantial competent evidence and should be set aside.
We will address the issues in that order.

Is Lindsey bound by the AGC contract instead of an implied-in-fact contract as the comt found?

The district court found that the evidence simply failed to establish an express contract consisting of either the terms of Lindseys AIA form or Murrays AGC form on any of the four projects because there was no evidence that the parties expressed their mutual assent orally or in wilting to the terms by which Lindsey would work. The district court found that the sequence on one or more *511 of die projects of Murray sending its proposed AGC contract to Lindsey, Murray telling Lindsey to begin work, and then Lindsey beginning work, did not establish mutual assent to the terms of the AGC contract. Murray argues the courts interpretation of the facts is wrong.
Murray contends that the district court failed to properly apply Kansas contract law and asks us to remand the case. In Murrays view, an express contract was formed because Lindsey accepted the terms of Murray’s AGC contract by commencing performance and submitting required preconstruction documents such as a schedule of values and proof of insurance in compliance with the terms of the AGC contract.
A review of some fundamental points of contract law is helpful at this stage. Whether a contract has been formed depends on the intent of the parties and is a question of fact. U.S.D. No. 446 v. Sandoval, 295 Kan. 278, 282, 286 P.3d 542 (2012). To form a binding contract, there must be a meeting of the minds on all essential elements. Contract formation requires an unconditional and positive acceptance. A conditional acceptance is really a counteroffer and no contract is formed. Sandoval, 295 Kan. at 282.
We acknowledge that parties may be bound by the terms of a contract, “even though they do not sign it, where their assent is otherwise indicated, such as by accepting and acting upon the contract, or by ratifying the contract, or by the acceptance by one of the performance by the other.” 17A Am. Jur. 2d, Contracts § 172, p. 184.
Murray relies primarily on the holding in Gunnison v. Evans, 136 Kan. 791, 794, 18 P.2d 191 (1933), to support its position. The Gunnison court held that an offer of a unilateral contract, in which the offeror malees a promise, may be accepted by compliance with tire request in die offer. The ruling relies upon Restatement (First) of Contracts § 56, comment a. We note that the Restatement also provides: “An offer can be accepted by the rendering of a performance only if the offer invites such an acceptance.” Restatement (Second) of Contracts § 53 (1981).
The facts in Gunnison reveal a much simpler set-of expectations of the parties than what is present in this case. Lee Gunnison *512 promised, in a writing dated October 9,1928, that Fred Evans and family could occupy Gunnison’s home as long as they wished. Gun-nison reserved a room for his own use and he would have board and meals for no charge. Evans was to pay the gas, light, and water. In September 1929, Gunnison notified Evans to leave within 30 days. The district court found that the Evans family had, from the time they moved in,
“‘furnished [Gunnison] with free board and meals, free lodging, free gas, light and water at all times that the same were desired, requested or accepted by the plaintiff, and the defendants stand ready, able and willing at the present time to accord tire plaintiff all of tire privileges reserved by him in said writing 136 Kan. at 793.
The Supreme Court held that the writing contained an offer in the form of a promise by Gunnison that the Evans family could use and occupy his home as long as they desired, on stated terms. The writing did not ask for a return promise by Evans such as “[w]e promise to allow you to use your own room, promise to furnish you meals without charge, and promise to pay gas, fight and water bills.” 136 Kan. at 794. Rather, the writing/offer called for forbearance with respect to the room and performance of specified tasks. The court held that the Evans family accepted the offer by “actual performance of tire conditions embodied in” the offer. 136 Kan. at 794.
Though Gunnison sets out the basic rule that acceptance may be accomplished by performance, it is distinguishable from this case for two reasons. First, the AGC subcontract was not offered as a unilateral contract. Murrays transmittal letter specifically requested a return promise—that Lindsey sign and return a copy of tíre contract. Lindsey did not comply with the request of the offer. Second, Lindsey did not perform the terms of the AGC subcontract and was not ready and willing to.
There is a difference between the few discrete acts that Gun-nison asked Evans to perform—allow Gunnison to use his room, furnish meals, pay the gas, fight, and water bills—and the lengthy AGC subcontract. There is simply not sufficient evidence in the record to establish an acceptance by performance as stated in Gun-nison.
*513 Continuing along this line, Murray contends that Lindseys submittal of the required preconstruction documents, such as a schedule of values and proof of insurance, is sufficient evidence of acceptance by performance. But there was no evidence that Lindsey was assenting to the AGC subcontract when it submitted those documents.
Jon Lindsey testified that he submitted his insurance certificate and W-9 after the owner awarded Murray the general contract. Jon Lindsey also testified that he prepared a schedule of values upon a request by Gene Murray. Gene would call and tell him how to break it down. The several schedules of values that Lindsey submitted were all on AIA forms.
We cannot ignore the fact that the evidence shows that Lindsey sent a signed AIA subcontract to Murray after or on the same date that Murray sent the AGC subcontract. This action indicates that Lindsey rejected the AGC subcontract and submitted a counteroffer. The testimony was unclear about when the subcontracts were exchanged. The evidence on each project shows:
Blue Valley #22:
• AGC subcontract—letter of transmittal dated October 8, 2007;
• AIA subcontract—letter of transmittal dated November 5,2007; and
• Lindsey began work after March 1, 2008.
New Highlands:
• AGC subcontract—letter of transmittal dated March 17, 2008, handwritten notes indicate that it was delivered to a precon-struction meeting on March 26, 2008;
• AIA subcontract—letter of transmittal dated March 6, 2009, notes that it had been hand delivered on March 26, 2008, but was lost, and mailed per a request “from Leslie” on December 4, 2008; and
• Lindsey began work after November 20, 2008.
Sports Field Buildout:
• AGC subcontract—letter of transmittal dated November 24, 2009, notes that second set was sent on March 22, 2010;
*514 • AIA subcontract-—letter of transmittal dated December 2,2009; mailed March 22, 2010;
• Lindsey began work after January 3, 2010; and
• AIA revisions—letter of transmittal dated September 23, 2010, notes that two copies were taken to be hand delivered on October 7, 2010.
The principals of each company did not agree on much at trial. Jon Lindsey testified that Gene Murray called him on bid days and accepted his proposals. Gene testified that he did not accept Lind-seys proposals on bid days and would not have formed a contract with Lindsey until he was awarded the general contract, which was weeks later. Jon testified that he sent letters confirming the contract the day after bid days. Gene denied that he received the letters and noted that the letters did not contain Murray’s “received on” stamp.
What is clear is that neither the AIA nor the AGC subcontract were signed by both parties. The parties could not agree on an expression of acceptance. Thus, the evidence supported the district courts finding that no express contract was formed. Lindsey was not bound by the terms of Murray’s AGC form contract.

We look at one instance when Murray signed an AIA form.

During the Blue Valley #10 project, extreme weather conditions, including saturating rains, cold weather, and snow, caused problems. Delays resulted from problems accessing the job site, a lack of materials, a lack of communication, certain trades falling behind, and Murray’s failure to provide the owner a schedule for the project. The owner wanted to get the construction done so tire building could open for school at a certain time. Murray and the school district became concerned about tire progress of the masonry work and the sufficiency of the masonry manpower. The school district notified Murray that the masonry manpower needed to be supplemented to bring the project back on schedule.
In a letter to Lindsey dated July 26, 2010, Murray stated: “Notwithstanding the fact that a written agreement has not been executed, a contract exists between Murray & Sons Construction *515 Company, Inc. (Murray) and Lindsey Masonry Company as evidenced by die fact that Lindsey Masonry Company has undertaken performance and has been paid for its work.” The letter stated that Lindsey was in default and needed to fully man the project within 7 days to cure the default or Murray would hire a replacement subcontractor.
Murray modified the AIA subcontract form, signed it, and sent a copy to Lindsey with a transmittal letter dated September 23,2010. The letter asked Lindsey to review it, initial the changes made, and return it. Lindsey did not respond to the modified AIA form.
Gene Murray testified that he modified the AIA form and signed it because he knew he and Lindsey were headed for litigation if things did not straighten up on the project. A few days later, Murray sent Lindsay another letter stating that Murray was very concerned about the progress of the project and included a letter from the owner regarding its concerns.
Still concerned about the number of workers, Murray sent Lindsay a letter referring to certain paragraphs of the AIA subcontract:
• paragraph 2.1 subcontractor assumes all obligations and responsibilities that general contractor assumes to the owner;-
• paragraph 4.1.1 subcontractor is required to cooperate with general contractor in scheduling and performing the work to avoid delay;
• paragraph 3.3.1 subcontractor will be held responsible for liquidated damages for delays caused by the subcontractor; and
• paragraph 3.4.1 subcontractor must correct deficiencies within 3 working days or contractor will correct the deficiency and deduct the reasonable cost from payments due to the subcontractor.
The letter stated that Lindsey did not have a sufficient number of workers on the project and must increase its labor force within 3 days. Three days later, Murray sent notice that Lindsey failed to correct the deficiencies and Murray would proceed with hiring additional labor and deduct the reasonable costs from payments due to Lindsey.
Matters quickly went downhill from there. Gene Murray told *516 Jon Lindsey that he was not going to pay Lindsey. Lindseys attorney sent Murray a letter giving Murray 7 days’ written notice under section 4.7.1 of the AIA subcontract that Lindsey would stop work on the project if it did not receive payment on its payment application #8. The letter stated that the payment was due on September 25, 2010, and was “seriously delinquent.”
Pay application #8 was dated August 27, 2010. Lindseys counsel sent another letter requesting payment for “past due” amounts or Lindsey would stop work tire next day under section 4.7.1 of the subcontract until payment was received. That letter also stated that retainage amounts for payment applications #1 through #7 were past due.
Murray again told Lindsey that he was not going to pay and did not have the money. Jon Lindsey testified that after his conversations with Gene Murray on October 26, Murray turned off tire water supply that Lindsey used to mix mortar and removed the water meter from the hydrant so Lindsey could not work. Jon felt they were trying to force him off the job. As of October 27, Lindsey stopped work on the project and started to demobilize because of Murrays failure to pay and turning off the water.
Although both parties referred to certain subsections of the AIA form during their dispute, there was never an expression of acceptance to a single version of the contract. Even though Murray signed an AIA form contract on this one project it was signed only after Murray made significant alterations to the agreement; thus, making it actually a counteroffer that Lindsey refused. From this record we must agree with the district court—there was no express contract between the parties here.

Did the court erroneously exclude evidence of an agreement?

This brings us to Murray’s next issue. Murray contends that the district court improperly excluded evidence of mutually agreeable contract terms in the form contracts exchanged between the parties. Basically, Murray argues that Lindsey agreed to numerous provisions in the AGC contract because those same provisions were contained in Lindsey’s AIA contract and Lindsey’s conduct was consistent with those duties.
*517 Actually, the testimony that Murray refers to on appeal had nothing to do with the AGC contract. Rather, Murrays counsel was attempting to establish that a contract existed between the parties consisting of certain unmodified terms within the modified version of the AIA subcontract that Murry sent to Lindsey on September 23, 2010.
The district court sustained Lindseys objection because counsel was attempting to establish agreement to certain paragraphs within the modified version of the AIA subcontract when there was no evidence that Lindsey had accepted the modified version of the AIA subcontract. At a posttrial motion hearing, the district court explained that “each party rejected the subcontract of the other” and any “respective discre[te] similarities” between the subcontract agreements had “to be seen in the context of the larger document that was rejected.”
In our view, the district court’s ruling is consistent with the general rule that an acceptance of a contract must mirror the terms of the offer. 17A Am. Jur. 2d, Contracts § 80. A conditional acceptance is a counteroffer that rejects the original offer. Sandoval, 295 Kan. at 282. Lindsey and Murray did not have an agreement by virtue of Murray sending Lindsey a modified AIA contract. Instead it was another offer. Thus, there was no contract unless Lindsey accepted Murrays offer (the modified version of the AIA) in its entirety. And, when the district court ruled, there was no evidence that Lindsey expressed acceptance to tire modified AIA contract document.
But that does not necessarily resolve the issue of whether certain provisions in the contract documents exchanged by the parties were relevant to establishing the parties’ course of conduct for an implied-in-fact contract. Implied-in-fact contracts arise in Kansas most frequently in the employment context. Kansas courts consider certain factors to determine the understanding and intent of the parties when an employment contract is implied in fact:
“written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship *518 which would tend to explain or make clear the intention of the parties.” Allegri v. Providence-St. Margaret Health Center, 9 Kan. App. 2d 659, Syl. ¶ 5, 684 P.2d 1031 (1984).
Intent is a question of fact. Allegri, 9 Kan. App. 2d at 663.
When one party has knowledge of a term required by another party and continues to do business with that party without objection, the facts may establish that the party impliedly agreed to the term. See Atchison County Farmers Union Co-op Ass’n v. Turnbull, 241 Kan. 357, 363-64, 736 P.2d 917 (1987).
We now focus on the excluded evidence. Murrays attorney was cross-examining Jon Lindsey:
“Q. ... Do you recall receiving a modified AIA document from Murray and Sons at some point during the course of construction on the Blue Valley 10 project?
“A. I believe I received one from Gene Murray.
[[Image here]]
“Q. Okay. Now as to the provisions that have not been modified, would you agree that at least at this point in time, there was an agreement or a mutual agreement as to certain unmodified terms contained in the AIA document?
“MR. BECKETT: I’m going to object. That’s an unfair question. This is not an agreement of the parties. In fact, there’s a back story of this I’ll reveal as we go forward on this document and how—I would object to this line of questioning.
“THE COURT: I’m not going to sustain the objection to the line of questioning but I will sustain die objection to diat particular question.
[[Image here]]
“Q. Let’s look at paragraph 11.3.
“A. Yes.
“Q. That’s a provision we looked at earlier. Does diat appear to be in the same form as it was when you sent it to Murray?
“A. It appears to be.
“Q. So it appears diat this version that Murray sent to you is consistent with die version you sent to diem with respect to at least 11.3?
“A. As compared to 11.3.
"Q. Let’s look at paragraph . .. 3.4.1.
“MR. BECKETT: I’m going to object to the questioning of this witness as it relates to a document diat the parties didn’t enter into. And he has—the questioning of this witness has elicited testimony from this witness that neither parties executed the same agreement. Now questions about what might be contained in tiiis document, I don’t see how that’s relevant to die inquiiy before the Court. I don’t know where this is going but asking this witness to talk *519 about a document that he never entered into and selecting specific provisions out of that, I would object. I think it’s totally inappropriate.
[[Image here]]
“MR. ENTZ: We’re attempting to establish mutually agreeable terms between the parties]. Obviously, it’s not the ideal situation when we have a document signed by both. But we have a course of conduct that was established by the practices involved and also at this point in time we’re now exchanging at least certain terms that tend to mesh up, both partes are recognizing. That’s the point we’re trying to establish that certain provisions in here Lindsey Masonry sent to Murray and Sons and at some point in time, Murray and Sons recognized the provisions and sent them back to [Lindsey]. No, we’re not going to have a fully-executed contract at any point in time in discussing these projects but we will have mutually agreeable terms that are a basis for implied contracts between the partes.
“MR. BECKETT: ... But the partes never entered into any agreement relative to AIA 401 or relative to an ABC contract. That’s been established clearly in this case. I think admitted by both partes. So to go through an AIA document, that wasn’t entered into by the partes and try to piecemeal provisions and say they somehow apply to die analysis before die Court, I think, is improper.
[[Image here]]
“THE COURT: If I have an accurate grasp of the facts, the original proposal for diis particular project provided that the parties contemplated—what was the language— expected to enter into a 401.
[[Image here]]
“THE COURT: Mr. Lindsey forwarded a 401 that he signed to Mr. Murray. And it appears as though Mr. Murray made some changes in that and sent it back—and signed it—and sent it back to Mr. Lindsey and asked Mr. Lindsey to initial and accept die changes. That’s what it looks like.
“Now, in an effort to establish some terms that the defendants contend the partes agreed to in some way, Mr. Entz is taking a contract that—a form of the 401—tiiat Mr. Lindsey, at least there hasn’t been in evidence, that Mr. Lindsey agreed to. And if I understand what’s happening, Mr. Entz is attempting to ask Mr. Lindsey if Mr. Lindsey is agreeable to particular paragraphs, most recently 3.1 in an effort to try to establish an agreed ... financial arrangement between the partes. Now that’s what it looks like to me.
“I don’t tilink that that’s the proper way ... to do it under the circumstances of this case. So I’m going to sustain your objection, Mr. Beckett.
[[Image here]]
“Q. (By MR. ENTZ) When you received the AIA subcontract from Murray, ... Did you agree to or still agree to some of the provisions that you ha[d] previously proposed to Murray and Sons?
“MR. BECKETT: Your honor. Object.
“THE COURT: Sustain die objection for the same reasons previously expressed.”
*520 After trial, the court clarified its ruling: “[Ejach party rejected the subcontract of the other” and any “respective discre[te] similarities” between the subcontract agreements had “to be seen in the context of the larger document that was rejected.”
The district court did not exclude evidence about the parties’ conduct. An elaborate walk-through of each provision in the modified AIA subcontract would not have been useful because the document was already in evidence. But Murrays contention that the district court should have considered the contract forms exchanged between the parties when determining the terms of the implied-in-fact contract is not wholly unpersuasive. Lindsey surely intended to be governed by the terms of the AIA when Lindsey sent the AIA contract to Murray. On the other hand, there was little evidence that the parties ever, at the same time, intended to be governed by the terms of either contract.
After considering the clarification made by the court, we agree with its ruling and find no error in sustaining the objection.

The Kansas Fairness in Public Construction Contract Act applied to this contract.

The Act is found at K.S.A. 16-1901 et seq. It states that the term “'Contract’ means a contract or agreement concerning construction made and entered into by and between an owner and a contractor, a contractor and a subcontractor or a subcontractor and another subcontractor.” K.S.A. 16-1902(b). The Act does not distinguish between express contracts and implied-in-fact contracts.
Indeed, general law of contract principles dictate that an implied-in-fact contract has the same legal effect as an express contract:
“Parties may be bound as firmly by implied contracts as by those expressed in words, oral or written. The law implies, from circumstances and the silent language of men’s conduct and actions, contracts and promises as forcible and binding as those made by express words or through tire medium of written memorials.” In re Estate of Langdon, 165 Kan. 267, 274, 195 P.2d 317 (1948).
In other contexts, our Supreme Court has recognized that prejudgment interest applies to both express and implied contracts. Arrowhead Const. Co. v. Essex Corp, 233 Kan. 241, 251, 662 P.2d *521 1195 (1983), disapproved on other grounds by Wichita Sheet Metal Supply, Inc. v. Dahlstrom & Ferrell Constr. Co., 246 Kan. 557, 792 P.2d 1043 (1990).
The court held that the following facts implied an enforceable contract that arose between Murray and Lindsey.
“1. Murray asked Lindsey to submit a bid proposal for the masonry work.
“2. Lindsey submitted a bid and Murray received and used Lindseys bid in Murrays bid for tire general contract.
“3. Murray was awarded the general contract.
“4. Lindsey submitted a schedule of values.
“5. After Murray directed Lindsey to begin work on each project, Lindsey began, and performed work on each.
“6. Lindsey submitted to Murray a written subcontract signed by Lindsey, which proposed subcontract terms between the two parties; Murray submitted to Lindsey a written subcontract. . . with the provisions Murray proposed. Neither party signed the subcontract proposed by the other. No written or oral mutual assent to terms pursuant to which Lindsey would perform the masonry work on any of the four projects was ever expressed by the parties.
“7. Lindsey performed work on each of the projects and submitted pay applications to Murray for the work it performed using the schedule of values.
“8. Murray utilized Lindsey’s pay applications and schedule of values in its pay applications to the owner.
“9. Murray paid Lindsey pursuant to Lindseys pay applications, for certain of Lindseys work, but withholding retainage.
“10. The owner made payments to Murray pursuant to Murray’s pay applications.
“11. Change orders for the masonry work were agreed to and executed by the parties.”
The parties’ failure to define payment terms does not change the analysis. The Act does contemplate that payments should be made “pursuant to the terms of the contract,” but that is “[s]ubject to the provisions” in the subsections that follow. K.S.A. 16-1903(a). Subsection (f) states that the “contractor shall pay its subcontractors any amounts due within seven business days of receipt of payment from the owner . . . .” K.S.A. 16-1903(f). There are provisions for payment of retainage. K.S.A. 16-1903(f); K.S.A. 16-1904. The Act also states that the “rights and duties prescribed by this act shall not be waivable or varied under the terms of a contract.” K.S.A. *522 16-1901(b). Thus, the Acts payment provisions supersede and fill in the parties’ contract gap.
Gene Murray testified that his practice was to pay Lindsey within 7 days of receiving payment from the owner. Murray breached the contract when it did not pay Lindsey on its outstanding payment applications.
Were these 'payment obligations undisputed as required by the Act?
The Act requires a contractor pay its subcontractors on any properly completed and “undisputed” request for payment within 7 business days of receipt of payment by the owner. K.S.A. 16-1903(f). If the contractor fails to pay its subcontractors within such timeframe, the contractor shall pay 18 percent interest on the “undisputed” amount. K.S.A. 16-1903(g).
Murray contends that the following payments were disputed:
• Blue Valley #22 Project: $5,511 of the $15,916 sought by Lindsey for damages that Murray sustained to repair a roof that was damaged during the construction.
• New Highlands Project: All of the $83,794 Lindsey claimed. Murray filed a counterclaim for $92,439 in damages for Lindsey’s failure to construct the storm shelter walls according to the plans.
• Sports Field Buildout Project: $4,166 of the $12,565 sought by Lindsey for damages Murray sustained as a result of delays in the construction schedule.
• Blue Valley #10 Project: All of the $654,862 claimed by Lindsey. Murray filed a counterclaim for $1,335,073 in damages that Murray sustained when Lindsey walked off the project.
The district court found the entire net judgment “undisputed.” At a later hearing, the court explained that there was never a dispute that the work described in the schedule of values was done. Though there were setoffs claimed, the underlying money that Lindsey was owed for doing the work described in his payment applications was not disputed.
Under the Act, “ ‘undisputed payment’ means payments which all parties to the contract agree are owed to the contractor.” K.S.A. *523 16-1902(i). A panel of this court has held that for a payment to be disputed, there must be some matter that can be disputed in good faith because Kansas contracts contain an implied covenant of good faith and fair dealing. VHC Van Hoecke Contracting, Inc. v. Murray & Sons Construction Co., No. 106,603, 2012 WL 2326027, at *3-4 (Kan. App. 2012) (unpublished opinion). When there is a dispute over whether the project was completed, then the amount is disputed and no prejudgment interest is available. See Midwest Asphalt Coating v. Chelsea Plaza Homes, 45 Kan. App. 2d 119, 126-27, 243 P.3d 1106 (2010) (resolving a claim brought under Kansas Fairness in Private Construction Contract Act).
This boils down to whether Murrays counterclaims make Lind-seys claim for money owed under the contract “disputed” under tire Act. Reasoning by analogy, we think not. - Kansas law generally provides that prejudgment interest is allowable on liquidated claims. A claim is liquidated when both the amount due and the date due are fixed and certain or ascertainable by mathematical computation. Miller v. Botwin, 258 Kan. 108, 119, 899 P.2d 1004 (1995).
An examination of general legal principles makes our point. A question about the amount of a setoff or counterclaim does not change the liquidated nature of the damages for breach of contract. Arrowhead Const. Co., 233 Kan. at 251; Phelps Dodge Copper Products Corp. v. Alpha Construction Co., 203 Kan. 591, 594-97, 455 P.2d 555 (1969); J. Walters Const. Co. v. Greystone South Partnership, 15 Kan. App. 2d 689, 698-700, 817 P.2d 201 (1991).
Again, “ 'the debtor may not defeat the creditor’s right to interest on such a claim by setting up an unliquidated claim as a set-off.’” Phelps Dodge Copper Products Corp., 203 Kan. at 596. In Phelps Dodge Copper Products Corp., there was no dispute as to the amount owed to Phelps Dodge for goods sold and delivered. Phelps Dodges claim was liquidated when payment became due. The fact that the extent of delay damages sought as a counterclaim had not been determined did not change the liquidated nature of Phelps Dodge’s damages. 203 Kan. at 594-97. Raising counterclaims does not erase the fact that Lindsey did the' work and was entitled to payment.
*524 Murray cites Arrowhead Const. Co., 233 Kan. 241, Syl. ¶ 7, where the court affirmed denial of prejudgment interest because the amount of damages was not liquidated until the trial court found that the piice of the contract was for $1.35 per square foot. It offers little support. In that case, the price that one party was obligated to pay the other for services was contested. Here, tire amount that Murray agreed to pay Lindsey for performance of the masonry work was not contested.
Lindsey was owed money for work that it had performed. Murray was paid by the owner for this work. Lindseys claims were liquidated 7 days after Murray was paid for the work by the owner. See K.S.A. 16-1903(f). The district court was correct. A brief review is helpful here.
On the Blue Valley #22 project, the entire $15,916 could be viewed as undisputed. Lindsey completed its work on the project. The $5,511 in damages that Murray sought to repair the roof did not change tire undisputed nature of tire amount that Lindsey was due under tire contract. There was no evidence that Lindsey damaged the roof. Murrays theory for relief was that Jon Lindsey had agreed to pay a V3 share of the cost to repair the roof.
On the New Highlands project, Lindsey completed its work. Lindsey submitted unpaid pay applications in the amount of $83,794. The district court held that Murray was entitled to recover $55,250 to remediate the rebar omission. The district court also held that Murray was entitled to recover $5,957 in damages to remediate damage to the water proofing and protection board. The district court set off Lindseys damages accordingly, resulting in a $22,587 judgment awarded to Lindsey. The court awarded interest, costs, and attorney fees on the net judgment only. Murray had claimed an additional $31,232 in damages, but it did not brief this claim. The net judgment of $22,587 could be viewed as undisputed.
With regard to the Sports Field Buildout, the entire $12,565 could be viewed as undisputed. Lindsey completed its work on the project. Murray claimed $4,166 in damages for weather-related delays. But delay damages do not change the liquidated nature of the claim. Phelps Dodge Copper Products Corp., 203 Kan. at 594-97.
*525 With regard to the Blue Valley #10 project, the entire judgment could be viewed as undisputed. Lindsey submitted pay applications for work done in August, September, and October 2010. Lindsey represented it had completed 65 percent of the work. Murrays damages it alleged in its counterclaim were incurred after Lindsey stopped work. That does not affect the certain sum owed to Lindsey.
In a separate attack, Murray argues that attorney fees and interest could not be awarded under the Act because the contract was unknowable until the district court defined its terms. Murray cites a quantum meruit case for support Midwest Asphalt Coating, 45 Kan. App. 2d 119. A panel of this court held that the Kansas Fairness in Private Construction Contract Act did not apply to a quantum meruit case because the damages were never determined until the award was made. 45 Kan. App. 2d at 126-27. While the two Acts—covering public contracts and private contracts—seek the prompt payment of agreed amounts, we are not persuaded by this quantum meruit argument.
When a court resolves a case based on quantum meruit, it finds that no contract existed. In such a case, the law creates a contract to prevent unjust enrichment. Mai v. Youtsey, 231 Kan. 419, 422, 646 P.2d 475 (1982). Thus, die Midwest Asphalt Coating court held that the damages were not liquidated until so created. 45 Kan. App. 2d at 127.
In contrast,- an implied-in-fact contract has the same legal effect as an express contract. In re Estate of Langdon, 165 Kan. at 274. The difference lies in how mutual assent was given. See Ellis v. Berry, 19 Kan. App. 2d 105, 108, 867 P.2d 1063 (1993); 17 C.J.S., Contracts §§ 5, 6; 17A Am. Jur. 2d, Contracts §§ 12,16. But importantly, the parties create an implied-in-fact contract, not the law.
Murray also cites the district court’s statement that the implied-in-fact contract contained “no time frame for payment.” However, the Act does provide a timeframe for payment. According to the terms of the Act, the parties cannot contract contrary to its terms. We find no error by the district court here.

*526
After finding that a contract existed, the district court did not need to explore equitable remedies.

It is fundamental that equitable remedies are generally not available if there is an adequate remedy at law. Nelson v. Nelson, 288 Kan. 570, 597, 205 P.3d 715 (2009); Midwest Asphalt Coating, 45 Kan. App. 2d at 123; 42 C.J.S., Imphed Contracts § 8. Damages for breach of contract is a legal remedy.
This case was tried upon the theory of breach of contract. Contracts can be express or implied in fact. Both express and implied-in-fact contracts require assent. The difference is how assent is manifested. Assent to an express contract is shown by written or spoken words; while assent to an implied-in-fact contract is inferred from conduct. See Ellis, 19 Kan. App. 2d at 108; 17 C.J.S., Contracts §§ 5, 6; 17A Am. Jur. 2d, Contracts §§ 12,16.
Contraiy to Murrays contentions, the trial court did find that a contract existed—an implied-in-fact contract. Thus, the court had no reason to resort to equitable remedies.

Sufficient evidence supports the finding that Murray breached this implied-in-fact contract.

Murray contends that there was not substantial competent evidence to support the trial court’s finding that Murray breached the implied-in-fact contract.
We review the trial court’s factual findings for substantial competent evidence. Substantial competent evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. Gannon v. State, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014). Appellate courts do not reweigh the evidence, pass on the credibility of witnesses, or redetermine questions of fact. U.S.D. No. 233 v. Kansas Ass’n of American Educators, 275 Kan. 313, 320, 64 P.3d 372 (2003).
This controversy centers on the end of the two companies’ working relationship. Murray contends that no payment was due to Lindsey at the time Lindsey walked off the job. Murray also contends that substantial competent evidence does not support the district court’s finding about why Lindsey walked off the job.
Indeed, the parties’ payment history shows that no payment was *527 due to Lindsey at the time Lindsey walked off the job. Lindseys proposal provided payment terms. The proposal stated that payment was to be made 30 days after application and retainage was to be no greater than 5 percent. Murray never accepted those terms. On October 18,2010, Lindsey’s attorney wrote to Murray that payments were “seriously delinquent” and referred to section 4.7.1 of the AIA subcontract (remedies for nonpayment). At trial, Jon Lindsey acknowledged that no payments had been made within 30 days and that 10 percent retainage was withheld throughout, though his pay applications stated 5 percent should be withheld.
The district court found that section 4.7.1 of the AIA subcontract could not have served as a basis for Lindsey to stop work and, in fact, it was not the reason that Lindsey stopped work. Murrays words convinced Lindsey to leave.
“The Court finds and concludes that it was not the payment schedule or delay the lawyer referenced that were the reason Lindsey stopped work but rather Murray s repeated statements to Lindsey that Murray was not going to pay combined with Murray’s shutting off the masonry's necessary water and removing the meter that is the reason provided by the evidence and there was no evidence to the contrary or even disputing it.”
The court later clarified this finding:
“When the subject came up, the testimony was that Mr. Murray said he was not going to pay—Murray Construction was not going to pay Lindsey Masonry.
Now when that testimony was offered, it was never said, and the testimony never was, that Murray is not going to pay Lindsey because they don’t have the money. Or, Murray is not going to pay Lindsey because payments are not yet due.
Now I understand that you would like to extract that, and an argument could be made, but that wasn’t the way that testimony was offered, and was not contradicted.
Mr. Lindsey said he was told, on more than one occasion, I’m not going to pay. Period.
And so you—I didn’t find any evidence to support a conclusion that the statement was: I’m not going to pay because a payment is not due. Or, I’m not going to pay because I haven’t been paid by the owner. I didn’t find any evidence of that.”
Jon Lindsey testified that Gene Murray told him several times that he was not going to pay Lindsey. A fair reading of Jons testimony is that Gene said he was not going to pay, period. Gene did not contradict or explain Jons testimony. Lindsey testified that *528 his company stopped working because of Murrays failure to pay, turning off the water, and forcing Lindsey off the job. The district court’s finding was supported by substantial competent evidence.
Finally, Murray contends that the courts finding that Murray turned off the water and removed the meter is not supported by evidence. Jon Lindsey testified that Murray turned off Lindsey’s supply of water to mix mortar and removed the water meter from the hydrant so Lindsey could not work. A Murray witness testified Lindsey had access to water. We will not reweigh the evidence. See U.S.D. No. 233, 275 Kan. at 320. That task is for the district court and its findings are supported by substantial competent evidence.
Affirmed.
# # #