NOT DESIGNATED FOR PUBLICATION

No. 121,113

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STRAIGHTLINE HDD INC.,
*Appellee*,

v.

SMART E-SOLUTIONS, INC.,
A PARTNER OF TANDEM TECHNOLOGIES, INC.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; PATRICIA MACKE DICK, judge. Opinion filed May 8, 2020. Reversed and remanded with directions.

*Thomas A. Dower*, of Gilliland Green LLC, of Hutchinson, for appellant.

*Gregory D. Bell*, of Bell and Robinson LLC, of Hutchinson, for appellee.

Before WARNER, P.J., POWELL, J., and LAHEY, S.J.

PER CURIAM: Smart e-Solutions, Inc., appeals the district court's finding that it breached an implied contract with Straightline HDD, Inc., to provide technical support for software Straightline purchased. Having carefully reviewed the trial record, we agree with Smart that the district court's finding is not supported by substantial competent evidence. We therefore reverse the district court's judgment for damages and remand with directions that judgment be entered in Smart's favor.

1

Although this case comes to us by way of a bench trial, the underlying facts are largely undisputed. Straightline, based in Hutchinson, manufactures and sells oilfield equipment. In 2014, Straightline was using an accounting software program called ACCPAC, developed by Sage, and a production management program called MySys.

Sage is a Hong Kong-based software developer. Customers cannot purchase Sage software directly from the company. Instead, they must purchase Sage products through a certified reseller. And customers can have only one designated reseller at a time. This relationship provides customers a go-to source for software purchases and updates, as well as a Sage-certified contact for product support. It also allows the reseller to communicate with Sage if a customer has problems or questions.

Straightline had become frustrated with MySys and began to consider using a different production management software. In December 2014, Straightline's Sage reseller informed Straightline's manager of information systems, Garth Hansen, about a different program—Auto Simply—that could replace MySys. Auto Simply allows a company to monitor its entire manufacturing process and identify the parts, labor, and quality assurance steps that are necessary to build (and bill customers for) manufactured equipment. Because Auto Simply was a Sage product, the program was designed to integrate with Straightline's ACCPAC accounting program.

*Smart becomes Straightline's reseller for Sage products.*

In the spring of 2015, Hansen downloaded a trial version of Auto Simply. According to Hansen, the trial version was nearly identical to the full version, except the trial version limited the number of records that could be processed. Because Straightline was having a "business disagreement" with its reseller, Hansen contacted Sage and asked

2

for a different designated reseller. Straightline was eventually paired with Smart, the local partner of a national company, Tandem Technologies.

Straightline executed a Reseller of Record Change Request Form for Sage on April 2, 2015, requesting that Smart/Tandem become its reseller. The change request indicated that Straightline's previous reseller would be notified of the request and that Smart would "now be responsible for servicing [Straightline's] account."

About a week later, Straightline and Smart executed a General Contract for Services, to run from April 9 through December 31, 2015. This contract indicated Smart would "provide services to [Straightline] on an hourly basis of $185.00 per hour." The 2015 contract also contained other terms, including a merger clause and a limitation on liability. The merger clause indicated the contract was "the entire agreement of the parties" and that "there are no other promises or conditions in any other agreement whether oral or written concerning [its] subject matter." In the limitation on liability, Straightline agreed "to not hold [Smart] liable for any software development, customizations, training, database repair and/or assessment of data, hardware or other failed systems whether provided by Sage or other 3rd party software providers."

Although it downloaded a trial version of Auto Simply in March 2015, Straightline did not install the software until October or November 2015. At that point, Hansen installed the software for Straightline and personally started configuring Straightline's data. Hansen experienced configuration difficulties almost from the outset but did not contact Smart.

Near the end of 2015, Smart sent Straightline an identical renewal contract to continue its support services through 2016. At trial, Hansen testified he did not recall seeing the e-mail from Smart transmitting the 2016 contract. Regardless, Straightline never signed a new contract for services, and the 2015 contract expired.

In March 2016, Hansen—still using the trial version of Auto Simply—e-mailed Smart and asked whether Smart had "some saved videos or PDFs" that could give Straightline "a 'quick start' kind of idea on how to get" the program set up for manufacturing orders. Hansen also asked, in case there were "no videos or PDFs/White papers," whether it would be "possible to get a little sales demo on this one component." Smart replied that it "would see this type of demo as more of a 'training' or 'technical support' event" that would be billed at an hourly rate.

On April 1, 2016, Smart provided a remote training session to Hansen and several other Straightline employees. Hansen, who was hoping for a sales demonstration, was unhappy with the presentation, which was more of a troubleshooting and support session. Despite Hansen's disappointment with the "demo," the Smart employee was able to fix the configuration problem. Following the session, Smart billed Straightline for one hour of support time, and Straightline paid this invoice. Smart informed Straightline that in the future—and especially if it decided to purchase software—it would be better if Straightline could purchase a block of time for training or installation (paid in advance) so Smart could ensure it had adequate time set aside to address Straightline's concerns.

*Straightline purchases a license for the full version of Auto Simply.*

Hansen continued to work with Auto Simply internally, and in August 2016 he contacted Smart and indicated Straightline would like to purchase a license for the full version of the program. On August 16, 2016, Karen Smart (Smart's CEO) e-mailed Hansen "a formal invoice for the Auto Simply software and required business care on the software for the first year from Auto Simply." The total cost of the software, business care, and taxes was $11,586.42. Hansen later communicated directly with Terence Ang, an Auto Simply software developer at Sage, for some customized programming for

Straightline; Ang sent a separate invoice for these services to Smart, which forwarded the invoice to Straightline for payment. Straightline paid both invoices.

At trial, Karen Smart explained that the required "business care" in the Auto Simply invoice was not part of Smart's support but rather was a required add-on from the software developer. This add-on provided Straightline "a knowledge base of support where [it could] go out to Auto Simply's website" and "read blog articles." In other words, by purchasing the Auto Simply software license, Straightline had "now become a customer of Auto Simply as well." Hansen testified that in purchasing a license for the full version of Auto Simply, he understood that Straightline would be receiving activation codes and additional "documentation." He stated that "[a]ny support and service between [Straightline] and Smart was [*sic*] always done on time and materials, so an hourly basis." The correspondence between the parties confirmed this understanding; Karen Smart informed Hansen around the time Straightline purchased Auto Simply that if Straightline required Smart's support services, "this would become billable time."

Before installing the full version of Auto Simply, a customer must accept the terms of Sage's End User License Agreement (EULA). The customer—here, Hansen for Straightline—receives a prompt with the agreement indicating the customer should "READ [the EULA] CAREFULLY BEFORE YOU CLICK ON THE 'I ACCEPT' BUTTON," and noting the EULA is a "legal agreement." The Auto Simply EULA contains the following "Warranty and Disclaimer":

> "a. <u>Limited Warranty</u>. Auto Simply warrants that for ninety (90) days from the date of original purchase the media on which the Software is contained will be free from defects in materials and workmanship.
> "b. <u>Customer Remedies</u>. Auto Simply's entire liability and Your exclusive remedy shall be replacement of the defective media. . . .
> "c. <u>Warranty Disclaimer</u>. To the maximum extent permitted by applicable law, and except for the limited warranty set forth herein, THE SOFTWARE (AND

5

ACCOMPANYING DOCUMENTATION) IS PROVIDED ON AN 'AS IS' BASIS WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED. WITHOUT LIMITING THE FOREGOING PROVISIONS, YOU ASSUME SOLE RESPONSIBILITY FOR SELECTING THE SOFTWARE TO ACHIEVE YOUR INTENDED RESULTS, AND SOLE RESPONSIBILITY FOR THE INSTALLATION OF, USE OF, AND RESULTS OBTAINED FROM THE SOFTWARE."

Straightline installed the program. After Straightline purchased the full version of Auto Simply and the customized programming, it continued configuring the software. Hansen largely handled the configuration on his own, but Straightline hired a third party to convert its data from its MySys system to the new Auto Simply system. Straightline received the converted data in December 2016—roughly four months after purchasing Auto Simply. Hansen then began to "test" the software using the converted data.

*Straightline has difficulty configuring Auto Simply.*

During the last week of December 2016, Hansen noticed that Straightline's "material costs" were not "adding up correctly" in Auto Simply. At trial, Hansen testified that he identified the problem as not involving "an error with the software," but instead was "something with the configuration" he had done. He continued to work with the software, but a few weeks later—on January 17, 2017—Hansen contacted Smart seeking "an hour [of] support."

Over the next two days, Karen Smart spent 1.75 hours helping Hansen troubleshoot the costing issue. She was able to build, according to Hansen, a "simple item with no sub-assemblies," and the "costing worked." Smart billed Straightline for 1.75 hours of support time, and Straightline paid this invoice.

Two days later, Hansen e-mailed Karen Smart and Terence Ang—the Sage developer who had provided the custom programming the previous fall—with additional

6

questions. When Hansen tried to build an "item with sub-assemblies" on his own, however, he ran into the same "costing issue" he had seen previously. Ang responded with some diagnostic tests for Hansen to perform so Sage could "identify the problem." When Karen Smart checked back with Hansen a few days later, he indicated he had not seen the e-mail from Ang but would run the diagnostic tests.

About a week later, on January 31, 2017, Hansen sent an e-mail to Karen Smart with an update. He indicated he had "spent the last week working on this whole process" and had sent Straightline's "database over to [Ang] to work on . . . at [Ang's] request." Hansen asked if he should send the database to Smart as well, stating, "I will take all the help I can get on this." Hansen also wrote, "I am thinking I have something set up wrong, but it all looks the same." Hansen asked, "Are there settings that you know of that would impact the system like this? Can someone take a look at our system and see what, if anything, needs to be modified to resolve this?"

Two days later, Hansen e-mailed Karen Smart again, stating he "ha[d] not yet heard from [her] or [Ang] on this issue." Hansen indicated, "We continue to have problems with the software, and cannot move forward. Is there a time you can log in remotely to our system and check to see what is wrong?" Hansen's e-mail concluded by noting that "[t]his is becoming a major problem for us at this time."

At trial, Karen Smart testified that, based on Hansen's comments in his January 31 e-mail, she believed that he and Ang were having discussions about Straightline's configuration issue independently from her. (For example, she understood from Hansen's e-mail that he had communicated with Ang after performing the diagnostic tests; Ang had requested Straightline's database; and Hansen had sent it to him.) Regardless, Karen Smart did not respond to Hansen's January 31 and February 2 e-mails. The parties did not exchange further correspondence until April 2017.

7

*Straightline requests a refund of its Auto Simply purchase.*

Because Straightline could not configure the software to work with its system, it terminated its configuration of Auto Simply. On April 19, 2017, Hansen asked Ang for a refund of Straightline's Auto Simply purchase. Ang told Hansen he had to go through Smart for a refund, and that "[f]or any refund to be allowed," Sage would need "to fully investigate first . . . to determine if [the issue] is system related."

Ang also contacted Smart for insight. Ang indicated that his "guess" was that Hansen was "doing all the setup by himself without involving [Smart]," which was why Straightline was "having all this difficulty." Ang indicated that "[i]f this is the case, [Sage is] not inclined to grant any refund." Karen Smart agreed with Ang's assessment, stating: "They made the decision [on] their own to purchase, on their own to install, on their own f[o]r training. We've had zero involvement whatsoever except to place the sale. I wouldn't give them a refund, I'd site [*sic*] your EULA."

On May 11, 2017, Hansen e-mailed Smart to inquire about "the status of a return of [Straightline's] purchase" of Auto Simply. Smart asked what Hansen had heard from Ang, indicating Smart could not "approve . . . returning software." Instead, "[t]hat [was] completely up to the software provider," and Smart had not received any e-mails "from Auto Simply about refunding money for software." Hansen replied that Ang "is not responding." He further indicated that "[Smart] sold us the product—we sent [Smart] the check—we have to get the refund from [Smart]."

On May 12, 2017, Karen Smart e-mailed Hansen, reiterating that Smart could not provide Straightline a refund. On June 23, Smart again informed Straightline that it would not be providing a refund, explaining:

> "The product did not fail. Straightline never gave Auto Simply the opportunity to resolve whatever issues [Hansen] was working on with Terence Ang at Auto Simply. Auto

8

Simply does not refund and that is stated clearly in the End-User License Agreement that [Hansen] clicked on when he self-installed the software. Straightline chose to not receive a demonstration before purchasing, chose not to have a certified consultant in Auto Simply install the software, and they chose not to receive any training on how to use the software. "

*Straightline sues Smart for breach of contract.*

Following this exchange, Straightline filed a breach-of-contract action against Smart, alleging the parties had "entered into a licensing agreement" for the Auto Simply software. Straightline alleged Smart had "breached the . . . license agreement" because

"the Auto Simply program failed to accurately calculate the cost of materials used in its manufacturing process and despite demand, [Smart] has been unable to remedy the issue; the Auto Simply program has failed to perform all functions necessary for [Straightline's] manufacturing operation as represented by [Smart]; and [Smart] has failed to provide [Straightline] with the necessary technical support to assure that the Auto Simply program would meet all of [Straightline's] needs."

As damages, Straightline sought a refund of the software purchase price—$11,586.42—because its Auto Simply license "has no value."

The case proceeded to a bench trial, where Hansen and Karen Smart were the only witnesses. The parties offered numerous documentary exhibits, however, including several e-mails, the 2015 contract, the unsigned 2016 contract, the invoices billed and checks paid, and the Auto Simply EULA. During closing arguments, Straightline asked the district court "to find that Smart has breached an implied contract, if nothing else." The district court took the matter under advisement.

Nearly a year later, the court ruled in favor of Straightline, concluding that an "implied-in-fact" contract existed between Straightline and Smart and that Smart breached that agreement. The court explained:

9

"The court finds that the ongoing purchase of services and payment pursuant to the original contract terms is the basis of the contract by extension and it is disingenuous for the defendant to say there is not a contract. The terms of the agreement did not change. . . . After a purchase and subsequent sessions trying to make the software work for their customer without a signed contract in place, . . . [Smart] is not entitled to say there is no privity of contract between the parties."

The court found, based on the parties' "ongoing course of conduct," that "the parties intended a contract," and this contract "was first presented in writing and subsequently that written agreement provided the terms of their ongoing implied contract." The court also opined more generally that "[p]art of the support offered as a reseller must include making the product have some value to the buyer. To sell a product and to be unable to support it is a breach of the reseller's obligation." The court concluded that Smart's failure to respond to Hansen's last e-mails on January 31 and February 2 was a "breach of [its] duty to provide support."

Based on these findings and conclusions, the court awarded Straightline damages for the purchase price of the software of $11,586.42. Smart appeals.

DISCUSSION

At its core, a contract is a promise between parties to be bound by certain agreed-upon terms. Kansas law recognizes that such agreements can be express—that is, memorialized orally or in writing—or implied from the parties' conduct. See *Lindsey Masonry Co. v. Murray & Sons Construction Co.*, 53 Kan. App. 2d 505, 526, 390 P.3d 56 (2017). In either case, there must be assent of the parties, i.e., a "meeting of the minds," "on all the essential elements." *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012). The nature of this assent is manifested in different ways: "Assent to an

10

express contract is shown by written or spoken words; while assent to an implied-in-fact contract is inferred from conduct." *Lindsey Masonry Co.*, 53 Kan. App. 2d at 526.

In an implied contract, the various parties' intent "need not be established by direct proof," but rather "can be shown by acts, circumstances, and inferences reasonably drawn therefrom." *Stover v. Superior Industries Intern., Inc.*, 29 Kan. App. 2d 235, 239, 29 P.3d 967 (2000). These acts or circumstances may include the parties' "'written or oral negotiations, the usages of business, the situation and object of the parties, the nature of the [parties' relationship], and all the circumstances surrounding the transaction.'" *Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659, 663, 684 P.2d 1031 (1984). An implied agreement cannot be established, however, "solely by [one party's] subjective understanding or expectation" about the transaction. *Kastner v. Blue Cross and Blue Shield of Kansas, Inc.*, 21 Kan. App. 2d 16, 23, 894 P.2d 909 (1995).

The existence of a contract and the parties' intentions are normally questions of fact. A party asserting the existence of a contract bears the burden of proving its terms by a preponderance of the evidence. *Sandoval*, 295 Kan. at 282. Appellate courts defer to the factual findings made below if they are supported by substantial competent evidence. See *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 73, 350 P.3d 1071 (2015). At the same time, courts have long recognized that when the legally relevant facts in a case are undisputed, the existence and terms of a contract are questions of law subject to de novo review. *Sandoval*, 295 Kan. at 282. And to the extent the parties' agreements are contained in writing, we exercise unlimited review over the interpretation and legal effect of those written instruments. See *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014).

Here, the district court found there was an agreement between Straightline and Smart that began with the written 2015 contract and—although no further written contract was signed—the parties continued to abide by the terms of the 2015 contract

11

going forward. Specifically, Smart continued to provide support services to Straightline at the hourly rate provided in the 2015 contract; the "terms of the agreement did not change." The court also found that, as Straightline's reseller, Smart had a "duty" to ensure Auto Simply had "some value" to Straightline. The court concluded that this "duty" or "obligation" was "depicted in the contract that was signed and based on the actions of the parties." In other words, the court found that although there was no express contract between the parties in 2016 and 2017, there was an "implied contract" for Smart to "provide support and assistance for Auto Simply."

On appeal, Smart argues the facts and law do not support the district court's conclusion that it had an open-ended contractual obligation to provide support for Auto Simply. According to Smart, the evidence at trial (including the parties' testimony and other documentation) does not show it breached any agreement. Smart further claims that the damages awarded by the district court in this case—a refund of the Auto Simply purchase price, plus interest from April 2017—are not legally or factually warranted. We agree.

Having reviewed the testimony and evidence submitted at trial, we conclude that many of the district court's factual findings are supported by evidence in the record. For example, although there was no written contract for services between Smart and Straightline after December 2015, the record supports the district court's finding that Smart on two occasions (for a total of 2.75 hours) provided support services to Straightline, billed hourly at the rate in the 2015 contract. Indeed, the testimony and evidence in this case demonstrates that Smart did not decline to provide technical support to Straightline after December 2015 based on the lack of a written contract for services.

Similarly, there is ample evidence to support the district court's conclusion that Smart declined to provide support services to Straightline after January 31, 2017. Although Karen Smart testified that she did not respond to Hansen's January 31 and

12

February 2 e-mails because she believed that Hansen was working directly with Ang at Auto Simply to address his questions, it is undisputed that she did not respond to these messages. And the parties agree there was no further communication between Smart and Straightline until Straightline sought a refund—first from Sage/Auto Simply and then from Smart—in April, May, and June 2017.

Critically, however, the record does *not* support the district court's finding that Smart had a *contractual obligation* to provide these support services whenever Straightline requested Smart's assistance installing or configuring Auto Simply—or to ensure the software would broadly provide "some value" to the customer. In particular, there was no evidence presented by either party tying the general technical support provided by Smart to Straightline's decision to purchase Auto Simply. And the record from the bench trial is devoid of evidence that Smart had any "duty" or "obligation" to provide ongoing support for Auto Simply or to ensure the software had "some value to the buyer." In fact, both parties' testimony and documentation point to the opposite conclusion.

The 2015 contract makes no reference to any duty or obligation by Smart regarding any software Straightline might purchase. In fact, the 2015 contract expressly indicated that Straightline agreed "to not hold [Smart] liable for any software development, customizations, training, database repair and/or assessment of data, hardware or other failed systems whether provided by Sage or other 3rd party software providers." Similarly, the Change of Reseller of Record form cited by the district court, which was filed with Sage—not Smart—merely stated that Straightline understood that Smart would "now be responsible for servicing [its] account." Neither of these documents shows any contractual "obligation" of Smart to make Auto Simply "have some value" to Straightline after it decided to purchase the software.

13

Nor are the district court's findings regarding Smart's broader "obligation" supported by the parties' conduct surrounding the Auto Simply transaction. The record reflects that Hansen downloaded a trial version of Auto Simply before Smart was Straightline's reseller. The only support or training Straightline requested from Smart regarding Auto Simply before it purchased the full license was a one-hour training session provided in April 2016, when a Smart representative was able to troubleshoot and fix configuration problems Straightline had been experiencing.

When Straightline purchased the unlimited Auto Simply license in August 2016, its invoice included the software license and one year of "Auto Simply . . . Business Care." Both Hansen and Karen Smart testified they understood that Straightline was not purchasing any support from Smart. Instead, Hansen explained that Straightline would be receiving "activation codes" and "documentation"—that is, access to documentation about Auto Simply on Auto Simply's website. Hansen testified that he understood that if Straightline wanted support services from Smart, he would need to request those services, and they would be provided on "an hourly basis." The district court's contrary inference—that the invoice's "Business Care" referred to some future service provided by Smart—directly conflicts with this testimony. In short, neither the documentary evidence nor the parties' testimony supports the district court's finding that Smart's role as a reseller imposed a contractual duty to provide support on an as-needed basis to ensure Straightline was satisfied with its Auto Simply purchase.

The district court's findings in this regard are also directly contradicted by the plain language of the Auto Simply EULA, to which Straightline agreed before installing the software. The EULA's warranty expired 90 days from the purchase date—here, months before Hansen sought any assistance from Karen Smart regarding his configuration troubles in January 2017. The EULA unambiguously stated: "THE SOFTWARE (AND ACCOMPANYING DOCUMENTATION) IS PROVIDED ON AN 'AS IS' BASIS WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED."

14

And it indicated that by going forward with the installation, Straightline "ASSUME[D] SOLE RESPONSIBILITY FOR SELECTING THE SOFTWARE TO ACHIEVE [ITS] INTENDED RESULTS, AND SOLE RESPONSIBILITY FOR THE INSTALLATION OF, USE OF, AND RESULTS OBTAINED FROM THE SOFTWARE."

The relevant facts in this case are largely undisputed. To the extent any agreement existed between Smart and Straightline, it was twofold: *First*, Smart would act as Straightline's Sage reseller, allowing Straightline to purchase licenses to Sage software and documentation (as it did with Auto Simply). *Second*, when Smart provided technical support services to Straightline, those services would be charged at the rate contained in the 2015 contract. Both parties complied with this arrangement.

The district court's decision was premised not on this implied contract, but instead on its conclusion that as a software reseller, Smart had a "duty" or "obligation" to provide support whenever Straightline requested it to ensure the software "ha[s] some value to the buyer." There was no evidence submitted at trial, however, of this open-ended, contractual obligation. Instead, it appears the district court's conclusion is based on its general, equitable belief that Straightline was treated unfairly when Smart "cut off communication," and that Straightline should therefore be refunded for the Auto Simply software. The court opined in its decision that Smart "sold to [Straightline] a product which would not work" and would not suit Straightline's needs. But Hansen testified that there was nothing wrong with the software; rather, his problem was a "configuration" issue. And Straightline made the decision to have Hansen and a third-party vendor handle the configuration, not Smart. In short, the remedy the court applied to address its perceived injustice was neither warranted nor supported by the evidence at trial.

The district court's finding that Smart breached its implied contract with Straightline is not supported by substantial competent evidence. Accord *Wiles*, 302 Kan. at 73 (defining substantial competent evidence as "'evidence which possesses both

15

relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved'"). In the absence of a breach, Smart cannot be held liable for Straightline's claimed damages. See *Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d 1083 (2013).

We therefore reverse the district court's judgment for damages in favor of Straightline, and we remand the case with directions that judgment be entered for Smart.

Reversed and remanded with directions.