No. 126,930

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MONARCH BUILD, LLC,
*Appellee*,

v.

DLH HOLDINGS, LLC, et al.,
*Appellants*.

SYLLABUS BY THE COURT

1.

Under K.S.A. 33-106, the statute of frauds prohibits the filing of an action to enforce an agreement that is not to be performed within one year unless it is in writing and signed by the party to be charged.

2.

If the performance of the agreement is possible within the time of one year, then K.S.A. 33-106 does not apply.

3.

In order to enter into a binding agreement, the parties must have a "meeting of the minds" on the material or essential terms.

4.

Whether the parties have entered into a binding agreement is a question of fact and depends on their objective intent.

5.

The lack of a signature on a written document does not preclude a court from finding a legally enforceable agreement if the evidence establishes an objective intent by the parties to enter into a binding agreement.

6.

A court may find the existence of a binding agreement as well as the terms of the agreement based on a combination of written instruments and the course of conduct between the parties. Such conduct may include acceptance of and action on the terms of the agreement, ratification of the agreement, or through the performance of the other party to the agreement.

7.

The purpose of awarding damages for breach of contract is to put the nonbreaching party in as good of a position as it would have been had the agreement been performed. Although damages need not be proven with absolute certainty, there must be a reasonable basis to enable the fact-finder to arrive at an approximate sum of damages.

8.

In the absence of statutory or contractual authorization, the parties to a civil action are to pay their own attorney fees.

9.

Conversion is the unauthorized assumption or exercise of the right of control over goods or personal property belonging to another to the exclusion of the lawful owner's rights. As a general rule, the damages recoverable for conversion are based on the property's value—at the time it was converted—plus interest.

10.

A party asserting a claim for unjust enrichment must show: (1) a benefit conferred by the plaintiff on the defendant; (2) a knowledge or appreciation of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant under such circumstances as to make it inequitable to retain it without payment of the value of the benefit received.

11.

Under K.S.A. 60-1110, an owner of real property has the option of obtaining a lien replacement bond to discharge a mechanic's lien filed against its property. To recover on the bond, the claimant must show that (1) it supplied material or labor; and (2) the material or labor was used to improve the real estate that was the subject of the lien.

12.

Kansas Supreme Court Rule 7.07(b)(1) (2025 Kan. S. Ct. R. at 52) authorizes appellate courts to award attorney fees on appeal in cases in which the district court had authority to award attorney fees.

13.

To recover attorney fees under the Kansas Fairness in Private Construction Contract Act, K.S.A. 16-1801 et seq., K.S.A. 16-1806 requires that the party seeking attorney fees show that the action was brought specifically to enforce the provisions of K.S.A. 16-1803, 16-1804, or 16-1805.

Appeal from Wyandotte District Court; CONSTANCE M. ALVEY, judge. Oral argument held on February 4, 2025. Opinion filed April 11, 2025. Affirmed in part and reversed in part.

*Stanley B. Bachman*, of Morefield Speicher Bachman, LC, of Overland Park, for appellants.

*Robert M. Pitkin*, of Horn Aylward & Bandy, LLC, of Kansas City, Missouri, for appellee.

3

Before ARNOLD-BURGER, P.J., BRUNS and PICKERING, JJ.

BRUNS, J.: This appeal arises out of the design and construction of a commercial building on real property located in Bonner Springs. The parties do not dispute that they entered into a binding agreement for Monarch Build, LLC, to design the building to be constructed on land owned by DLH Holdings, LLC, for the benefit of Wilkerson Crane Rental, Inc. But the parties disagree regarding whether their agreement also included the construction of the building. Because the parties failed to sign a written contract, it was left to the district court to sort through the evidence to decide the scope and the terms of the parties' agreement. Following a four-day bench trial, the district court determined that the parties had reached a binding agreement as to both the design and the construction phases of the building project. So, the district court entered a judgment in favor of Monarch Build.

On appeal, DLH Holdings and Wilkerson Crane Rental, Inc., have raised multiple issues relating to the applicability of the statute of frauds, the terms agreed upon by the parties, the amount of damages awarded, and the award of attorney fees. Based on our review of the voluminous record in light of Kansas law, we find that the district court did not err in determining that the parties entered into a binding agreement for both the design and construction phases. We also find that the district court appropriately entered judgment in favor of Monarch Build. Even so, we do not find that the district court had the authority to award attorney fees under the terms of the agreement reached by the parties. We also deny Monarch Build's motion for appellate attorney fees. Thus, we affirm the district court's judgment in part and reverse it in part.

FACTS

*The Parties*

Monarch Build, LLC, is a general contracting, construction management, and design-build firm headquartered in Overland Park. In 2017, Eric Turner started the limited liability company. Turner later sold a one-half interest in the company to Courtney Kounkel. He continued to have an ownership interest in the company until July 2020. At that point, he sold his interest to Kounkel, and she became the company's sole owner.

DLH Holdings, LLC, is a Kansas limited liability company and the owner of the real property in Wyandotte County upon which the commercial building that is the subject of this lawsuit was built. DLH Holdings leases the real property to Wilkerson Crane Rental, Inc., which provides a variety of services relating to the rental, hauling, and storage of heavy equipment. Diana Holt is the sole member of DLH Holdings and is also the sole officer, director, and shareholder of Wilkerson Crane Rental. Her husband, Jeff Holt, is the director of operations for Wilkerson Crane Rental.

*The Project*

On May 30, 2019, Turner—who was part-owner of Monarch Build—was told about a project for Wilkerson Crane Rental that would include the construction of a commercial building to be used for offices and a shop facility. A week later, Turner and Greg Highbarger—a principal of HD Architecture—met with Diana and Jeff Holt to discuss the project. The next day, Jeff Holt emailed Turner and expressed the desire to retain Monarch Build to move forward with the project. The parties dispute whether this meant that Monarch Build was retained only to perform design work or whether it was also retained to complete the construction of the new building.

5

Kounkel then sent out an email to Monarch Build employees, which described the new project:

> "Wilkerson Crane—This is an exciting win because it was not on our radar. We heard about this project and were awarded the project within a weeks time! This will be a $4M design/build new building project and we have teamed up with h | d Architecture. Construction could start as early as the end of this year."

On July 10, 2019, Monarch Build presented an initial "Preconstruction Proposal" to DLH Holdings and Wilkerson Crane Rental. This proposal was subsequently revised by Monarch Build at least two times. Monarch Build also retained HD Architecture and Renaissance Infrastructure Consulting (RIC)—an engineering firm—to serve as consultants on the project.

When speaking of the project, Monarch Build consistently referred to the venture as a design-build project. For example, in an email to Apex Engineering dated September 20, 2019, Turner stated: "[W]e have been engage[d] via design/build delivery method. HD Architecture is our architectural partner but wanted to bounce it off you to gauge your interest for the structure." Similarly, DLH Holdings and Wilkerson Crane Rental represented to lenders that Monarch Build would be doing the construction as well as the design of the building. This is reflected in an email dated September 23, 2019, from Central Bank to Diana Holt in which the bank confirmed: "As you noted[,] the contractor will be Monarch Construction, who will be finalizing the plans and construction costs."

In the initial project schedule prepared by Monarch Build, it was noted that commencement of the design phase of the project began on September 26, 2019. It stated that the construction phase of the project would begin on March 4, 2020, and that the building would be substantially completed on September 1, 2020. Monarch Build also opened up a "New Project Information Sheet" on October 2, 2019. On the information sheet, Turner described the venture as a "Design build project."

6

On September 30, 2019, Turner filled out a customized "Standard Form of Agreement Between Owner and Design-Builder"—commonly referred to as an A141—prepared by the American Institute of Architects for the project. The document described the work to be performed by Monarch Build as the design and construction of a 20,000 square foot pre-engineered metal building to be owned by DLH Holdings and used by Wilkerson Crane Rental. Although the A141 was presented by Monarch Build to the Holts, they never objected to or requested a modification of the description identifying the project as including both the design and construction of the commercial building.

In forwarding the A141 agreement to Diana Holt on September 30, 2019, Turner stated:

> "In follow up to our meeting last week, please find attached the draft copies of the design build agreement as well as the PDF of the preconstruction proposal. I am working with my assistant to populate all pertinent information in the contracts but wanted to get the drafts to you for you to share with your bank or others to start their review."

The final version of the A141 agreement—which included the information that was missing from the initial draft—was presented to DLH Holdings and Wilkerson Crane Rental on October 10, 2019. Consistent with the draft, the final version of the A141 agreement identified Monarch Build as the "Design-Builder" on the project. In addition, the agreement described the work to be performed by Monarch Build as follows:

> "**§ 1.4.3 The Work.** The term 'Work' means the design, construction and related services required to fulfill the Design-Builder's obligations under the Design-Build Documents, whether completed or partially completed, and includes all labor, materials, equipment and services provided or to be provided by the Design-Builder. The Work may constitute the whole or a part of the Project."

7

Furthermore, the final version of the A141 contained the following description of the project that DLH Holdings and Wilkerson Crane Rental had engaged Monarch Build to complete:

> "**§ 1.4.4 The Project.** The Project is the total design and construction of which the Work performed under the Design-Build Documents may be the whole or a part, and may include design and construction by the Owner and by separate contractors."

On November 25, 2019, Monarch Build, HD Architecture, and RIC submitted the design drawings for the project to DLH Holdings and Wilkerson Crane Rental. The drawings identified Monarch Build as the "DESIGN/BUILD CONTRACTOR." DLH Holdings and Wilkerson Crane Rental submitted a set of the design drawings to Landmark Bank as part of their construction loan application. Additionally, RIC identified Monarch Build as the contractor for the construction portion of the project in an email sent to the Kansas Department of Transportation in January 2020.

On January 7, 2020, DLH Holdings and Wilkerson Crane Rental also started the process to obtain a Small Business Administration (SBA) loan from Wakarusa Valley Development. In connection with this application, Tim Bateman—who was serving as the Chief Financial Officer (CFO) for both DLH Holdings and Wilkerson Crane Rental—expressly identified Monarch Build as "the builder" for the project. Around the same time, Cannon Building Systems was retained by Monarch Build as the subcontractor responsible for supplying, fabricating, and erecting the pre-engineered building to be constructed on DLH Holdings' property.

On January 13, 2020, Cannon Building Systems ordered the pre-engineered building from its supplier—Varco Pruden (VP) Buildings—and reserved a crane that would be needed for the erection of the building. In addition, Cannon Building Systems retained Lane Iron Work to perform the work of erecting the pre-engineered building. The following month, HD Architecture completed a set of drawings that were submitted

8

to the City of Bonner Springs to obtain the building permit so that construction could begin. Those drawings also identified Monarch Build as the "DESIGN/BUILD CONTRACTOR."

At the end of February 2020, Monarch Build uploaded the finalized construction drawings online so that subcontractors could provide construction bids for the project. Notably, the bid notice described the project as follows: "Wilkerson Crane is a 27,064 SF new building on a green field consisting of office and industrial shop space. MONARCH has been awarded the contract." About the same time, Monarch Build also began preparing exhibits to obtain insurance and bonds for the construction portion of the project.

On March 2, 2020, Monarch Build applied for a building permit with the City of Bonner Springs as the general contractor for the construction project. Monarch Build then conferred with the Unified Government Public Health Department regarding the need to install an onsite wastewater system on the property during construction. After compilation of the "hard costs" for the construction phase of the project from the subcontractors, Monarch Build provided DLH Holdings with an updated total project budget of $6,502,011. This amount included the cost of both design and construction.

Despite the COVID-19 pandemic, Monarch Build advised the subcontractors that once a permit was approved, DLH Holdings and Wilkerson Crane Rental wanted to move "full steam ahead" with the construction of the building. Around the same time, Diana Holt was working with Landmark National Bank to finalize the construction loan. On April 10, 2020, Monarch Build provided DLH Holdings and Wilkerson Crane Rental a "final budget" for the project—which again included both design and construction—in the amount of $6,750,418.

9

On April 20, 2020, Monarch Build informed the City of Bonner Springs that it had received approval from DLH Holdings and Wilkerson Crane Rental to move forward with construction of the building. Specifically, Monarch Build's email to a representative of the City stated:

> "We received Approval on Friday to proceed with the Owner. We will be working on finalizing contracts and getting guys rolling pretty quickly. I've copied Chris Hinkin who will be the Project Manager for Monarch. We've received approval from the UG for the septic system and will be working with our subcontractor to pull that permit to provide you as well. Thanks for all your help!"

Four days later, on April 24, 2020, Turner sent a revised A141 design-build agreement on behalf of Monarch Build to DLH Holdings for the design and construction of the building.

The revised-final version of the A141 agreement included—among other things—the following terms:

(1) The date of the parties' agreement was listed as October 7, 2019;

(2) A total contract amount of $6,750,418 that included both design and construction according to the "final budget" dated April 10, 2020—which was attached as an exhibit to the agreement—and was approved by DLH Holdings and Wilkerson Crane on April 17, 2020;

(3) The scope of the design and construction performed and to be performed on the project as reflected in the drawings attached as an exhibit to the agreement;

(4) A schedule for the design and construction portions of the project as reflected in an exhibit to the agreement dated April 22, 2020;

(5) Monarch Build's fee and markup of 5%;

(6) Monarch Build's ownership and rights regarding the design, drawings, and instruments of service for the project; and

10

(7) The damages owed by DLH Holdings to Monarch Build upon a termination for convenience.

The revised-final version of the A141 design-build agreement expressly referenced the final design drawings approved by the City of Bonner Springs on March 2, 2020. Once again, neither Diana Holt nor any other representative of DLH Holdings or Wilkerson Crane Rental objected to or requested modification of the revised A141 agreement. Upon receiving the document, Diana Holt forwarded it to Jeff Holt and to Bateman, the CFO of Wilkerson Crane. At trial, Diana Holt testified that the agreement was ready for execution once the construction loan was finalized. She explained that it was her intent at that time to move forward with Monarch Build directing the construction based on the budget that had been agreed upon.

Similarly, Turner testified at trial that as of April 2020, the scope, the pricing, and the schedule of the construction project had been agreed to by the parties. He also confirmed that Monarch Build had never received an objection to or request for modification of the provisions set forth in the final A141 agreement. On the other hand, Turner testified that not all the terms and conditions set forth in the document had been agreed upon by the parties.

In reliance on the perceived agreement between the parties regarding the scope of the project, Monarch Build assigned staff—including a project manager, an on-site superintendent, and a project coordinator—to begin construction of the commercial building on DLH Holdings' real property. It also began including the status of the construction in weekly internal operations meetings. In addition, Monarch Build took steps to establish gas and electrical service to the construction site.

Bateman—Wilkerson Crane Rental's CFO—testified by way of a deposition that was admitted into evidence at trial regarding these events. In particular, Bateman testified

11

that he could not recall any dispute between the parties regarding the final budget numbers for the design and construction of the building. He explained that no other contractors besides Monarch Build were being considered for the construction phase of the project. Likewise, Bateman could not recall having any concerns being expressed about the terms of the revised-final A141 design-build agreement provided by Monarch Build to DLH Holdings in April 2020.

Monarch Build held an internal meeting on May 1, 2020, to hand the project off from the preconstruction team to the construction team. Around the same time, Monarch Build hired a superintendent for on-site construction and assigned a project coordinator to assist with billing during the construction phase of the project. At trial, Kounkel testified that by the beginning of May 2020, the project "was fully in the construction phase." By that time, Monarch Build had started drafting subcontracts for the construction of the building, had transferred the project to the construction phase in its accounting system, had set up a file in a construction industry project management software program that is used only during the construction phase, and had taken other steps in the construction process.

On May 4, 2020, an attorney for DLH Holdings, Scott Anderson, forwarded an application for a sales tax exemption certificate for the construction portion of the project with the Kansas Department of Revenue to Diana Holt. The sales tax exemption application filed by DLH Holdings represented that construction on the building site had started on April 23, 2020, and identified Monarch Build as the "prime contractor" for the construction project. The next day, Landmark Bank notified Diana Holt that the construction loan had been approved. Then, on May 12, 2020, Landmark Bank issued a formal loan commitment to DLH Holdings and Wilkerson Crane Rental for the construction project.

12

Ten days later, Wakarusa Valley Development preliminarily approved the SBA portion of DLH Holdings' construction loan. On May 26, 2020, VP Buildings prepared final erection drawings for the pre-engineered metal building and provided them to Cannon Building Systems and, in turn, they were provided to Monarch Build. Three days later, Scott Anderson forwarded the sales tax exemption certificate issued by the State of Kansas for the construction project to Diana Holt and Turner. Finally, on June 1, 2020, the SBA formally approved its portion of the construction loan.

In his deposition, Bateman testified that throughout the loan approval process, DLH Holdings consistently represented that Monarch Build was the contractor on the construction project. Similarly, Sayard Parrish, Vice-President of Commercial Banking at Landmark National Bank, also testified in her deposition that DLH Holdings consistently represented that Monarch Build was the contractor for the construction project throughout the loan approval process. As early as September 23, 2019, Diana Holt informed Landmark Bank that Monarch Build would be the contractor for the construction of the building. Likewise, in December 2019, when the plans were emailed to Landmark, Monarch Build was listed as the contractor.

According to Parrish, the bank "would want to know who the contractor was." She added that in May 2020, when the loan was approved, Landmark Bank still understood that Monarch Build would be the contractor for construction. When the parties signed the loan commitment letter on May 12, 2020, Landmark Bank understood that Monarch Build would be constructing the building. Moreover, Parrish testified that as late as June 10, 2020—when the closing date had been set—Landmark Bank understood that Monarch Build was the contractor.

*The Change in Direction*

Unfortunately, the relationship between the parties dramatically changed after Turner decided to leave Monarch Build in the spring of 2020. However, he did not officially terminate his ownership interest in Monarch Build for several more months. Although the substance of their conversations is unclear from the record, it appears that Turner continued to communicate with Jeff Holt about the project after he decided to leave the company.

On the morning of June 2, 2020, Diana Holt left a voicemail message for Kounkel asking that she call her about the project. When Kounkel returned the call that afternoon, she was told that DLH Holdings and Wilkerson Crane Rental no longer desired to have Monarch Build handle the construction phase of the project. Holt also inquired about how she could obtain the drawings for the design of the building. During his deposition, Bateman testified that although the plan throughout the project had been to use Monarch Build for both the design and construction portions of the project, Holt changed her mind after learning that Turner was leaving the company.

Later that afternoon, Diana Holt sent an email to Kounkel in which she wrote:

"I am just following up with an email about our discussion this morning.
"I have decided to only use Monarch for the design portion of this project and will be using a different builder for construction. I feel this is in my company's best interest, due to the ownership changes within Monarch. Please let me know how long it will take to get the completed set of plans and how you will be sending them . . . .

"To date, I have made 6 pay applications totaling $178,597.00. Pay application 6 had an increase of $32,900.00 for architectural services. I will need to confirm exactly what additional architectural services were added and then I can make the last pay application. If you would send a statement, along with a copy of the change orders, I would appreciate it."

14

On June 5, 2020, Kounkel met with the Holts and brought with her documentation regarding the unpaid architectural expenses that had been billed in March 2020. At the meeting, they also discussed the drawings for the project. Monarch Build took the position that—consistent with the terms of the A141 design-build agreement—it continued to own the design drawings. On the other hand, Diana Holt claimed that she had a "verbal agreement" with someone—who has not been identified—that the ownership of the drawings would be transferred to DLH Holdings.

A representative of Grayson Enterprise, LLC, picked up the approved building permit for the project on June 9, 2020. It is undisputed that the building permit was issued by the City of Bonner Springs in the name of "MONARCH BUILDERS" and stated that it was "NOT TRANSFERRABLE." Two days later, Jeff Holt advised Cannon Building Systems that Grayson Enterprise had replaced Monarch Build to complete the construction phase of the project.

After Monarch Build became aware that grading work was being performed on the construction site, it directed an attorney to send a cease-and-desist letter to DLH Holdings, Wilkerson Crane Rental, and Grayson Enterprise on its behalf. In the letter— which was dated June 23, 2020—Monarch Build's legal counsel asserted that "there has been no default or breach by Monarch and the Cont[r]act has not been terminated by Wilkerson. Thus, any work by Grayson (or any other contractor) is improper and should immediately cease." The letter also stated that "the Instruments of Service are owned by Monarch and may only be used for the Project by Monarch or with Monarch's permission and prior written agreement acceptable to Monarch, which has not been provided . . . ."

On July 6, 2020, Kounkel and Turner participated in mediation regarding their respective ownership interests in Monarch Build. As a result of the mediation, Kounkel agreed to a buyout of Turner's interest in Monarch Build for an agreed upon sum. Eight days later, DLH Holdings and Wilkerson Crane Rental gave Cannon Building Systems

15

the "formal green light" to complete the fabrication work on the pre-engineered metal building. The next day, July 15, 2020, Turner officially ended his relationship with Monarch Build.

Around this time, Michael Strick—who had been the preconstruction director on the project—also left Monarch Build. During his exit interview, Strick told Kounkel that he was going to work for Turner. He then submitted a written proposal directly to DLH Holdings and Wilkerson Crane Rental seeking to perform work on the project in coordination with Grayson Enterprise. Ultimately, on September 23, 2020, Turner's new construction company—Forge Construction, LLC—took over the construction phase of the project from Grayson Enterprise. The next day, Monarch Build filed a mechanic's lien for $342,750.13 against the real estate.

After taking over the construction phase of the project, Turner's new company continued to use the design drawings prepared on behalf of Monarch Build without seeking or obtaining permission. Moreover, Strick and Chris Hinkin—who had formerly been the project manager for Monarch Build—continued to work on the project as employees of Turner's new company. Similar to Monarch Build, Forge Construction also started performing construction work for DLH Holdings and Wilkerson Crane Rental without having a signed written agreement. In fact, DLH Holdings and Forge Construction did not sign an A101 "Standard Form of Agreement Between Owner and Contractor" until October 2, 2020.

*The Lawsuit*

On February 26, 2021, Monarch Build filed a petition in district court against DLH Holdings, Wilkerson Crane Rental, and Landmark National Bank. The lawsuit sought to foreclose the mechanic's lien and included a claim for conversion arising out of the use of Monarch Build's plans and drawings to complete the project using a different

16

construction company. On April 15, 2021, the defendants filed an answer and counterclaim seeking adjudication of the mechanic's lien filed by Monarch Build and asserting slander of title and breach of contract claims. A few weeks later, the district court accepted a lien replacement bond issued by American Contractors Indemnity Company (ACIC).

Monarch Build filed a first amended petition replacing its lien foreclosure claim against Landmark National Bank with a bond claim against ACIC on June 9, 2021. In response, DLH Holdings and Wilkerson Crane Rental filed an amended answer that dropped their lien adjudication claim but continued to allege slander of title and breach of contract. Later, Monarch Build answered the counterclaim and ACIC filed its answer to Monarch Build's first amended petition.

Prior to trial, the parties filed competing motions for summary judgment. The district court held a hearing to consider the motions on December 12, 2022. After considering the arguments presented, the district court denied the summary judgment motions filed by the defendants. In addition, the district court partially granted Monarch Build's summary judgment motion as to the defendants' slander of title counterclaim. Afterward, the defendants filed a motion to reconsider, and the district court amended its ruling to allow them to present evidence at trial in support of their slander of title counterclaim. Specifically, the district court gave permission for them to present evidence in an attempt to establish the elements of malice and damages suffered as a result of the alleged slander of title. Yet the record reflects that the defendants failed to present or proffer any such evidence at trial.

On February 1, 2023, the district court commenced a four-day bench trial. During the trial, Monarch Build presented the testimony of Diana Holt, Trevor Allen of Cannon Building Systems, Jeff Holt, and Courtney Kounkel. Monarch Build also presented the deposition testimony of Tim Bateman and Sayard Parrish as evidence. In their defense,

17

DLH Holdings and Wilkerson Crane Rental presented the testimony of Scott Anderson, Greg Highbarger, and Eric Turner. In addition, there were approximately 300 exhibits offered by the parties and admitted into evidence by the district court. At the end of the trial, the district court took the case under advisement.

*The Decision*

On April 6, 2023, the district court held a Zoom hearing to announce its decision in the case. The district court judge began by stating on the record that in addition to the evidence presented at trial, she had reviewed the "trial briefs" submitted by the parties and approximately 100 pages of notes that she had taken during the bench trial. Additionally, the district court judge indicated that she had reviewed the applicable law relating to the claims and counterclaims the parties asserted.

After making these preliminary comments, the district court determined that the parties had stipulated as to the existence of a binding agreement on the design phase of the project even though no written contract had been signed. The district court also adopted the facts set forth by Monarch Build in paragraphs 1 to 33 of its proposed findings of fact and conclusions of law. Next, the district court turned to whether the parties' agreement also included the construction phase of the project.

In concluding that the parties had also reached a meeting of the minds regarding the construction of the building, the district court found:

- Eric Turner was a part owner of Monarch Build, and he was in charge of the design-build project with DLH Holdings as the property owner and Wilkerson Crane Rental as the tenant.
- Monarch Build performed services for the design-build by retaining an architect, obtaining bids from subcontractors, preparing the project

18

budget, working to obtain the necessary permits, helping facilitate financing, and beginning work on the construction aspect of the project.

- Monarch Build retained Cannon Building Systems as the supplier of the pre-engineered building to be constructed on the real property.

- Monarch Build was led to believe that it had an agreement with DLH Holdings and Wilkerson Crane Rental for both the design and construction of the building.

- Turner never advised anyone at Monarch Build that this was to be a design-only project.

- On various documents presented to third parties—including the City of Bonner Springs, the bank, the architect, insurance companies, and the State of Kansas—Monarch Build was listed as the design-builder for the project.

- DLH Holdings and Wilkerson Crane Rental relied on these documents and never sought to correct them.

- Monarch Build took several actions in furtherance of the construction phase of the project including preparing an updated A141 design-build agreement, assigning an on-site construction superintendent, conducting a handoff meeting between the design and construction teams, working to obtain the subcontractors, providing drawings, arranging for utilities on the construction site, and assigning a construction project coordinator.

- Monarch Build took these actions with the full knowledge—and for the benefit—of DLH Holdings and Wilkerson Crane Rental.

- Although the updated A141 design-build agreement was ready for execution by the parties in April 2020, Turner had decided to sever his relationship with Monarch Build.

- Turner and Jeff Holt were friends and continued to communicate with one another after April 2020.

19

- Turner sent Jeff Holt a text in May 2020 in which he asked whether Jeff had talked to his wife about a letter—evidently informing Monarch Build about the change in direction.

- Diana Holt contacted Courtney Kounkel on June 2, 2020, and told her that DLH Holdings had decided to use a different contractor for the construction portion of the project.

- After the Holts met with Kounkel, Diana Holt telephoned Turner and had a 13-minute conversation.

- Monarch Build sent an invoice to DLH Holdings in July 2020 for work performed on the project between September 2019 and June 2020, but the bill remained unpaid except that Renaissance Infrastructure Consulting was paid directly for its services.

- Although Turner testified that any work performed by Monarch Build on the construction side of the project was simply the cost of doing business, this testimony was not credible.

- The letters submitted by Turner and Greg Highbarger were duplicitous and appeared to copy each other.

- The testimony of Turner regarding whether Monarch Build continued to work on the project after April 24, 2020 was inconsistent.

- The testimony that the relationship between Turner and Diana Holt was repaired in less than two months to be "incredulous" in light of the fact that Turner's newly formed company took over the construction of the project.

- Michael Strick left the employment of Monarch Build and became an employee of Turner's company and continued to work on the project.

- Turner's new company also worked on the construction of the building for a period of time without having a signed contract with DLH Holdings,

20

showing a "course of conduct" between the two that it was acceptable and their custom to work without a signed contract.

- The course of conduct between DLH Holdings, Wilkerson Crane Rental, and Monarch Build demonstrated that an agreement had been reached by the parties.

- The parties entered into an oral contract based on the terms set out in the A141 agreement submitted by Monarch Build on April 24, 2020.

- The oral contract between the parties included "both the design and build of the project."

- DLH Holdings "breached the oral contract without cause."

- Monarch Build is entitled to lost profits in the amount of $336,766.13, plus contractual interest of $107,765.13.

- Monarch Build is entitled to the balance due on its final invoice to DLH Holdings in the amount of $27,494.13.

- The approved construction bond discharged the lien and, as a result, Monarch Build is entitled to judgment against ACIC on its bond claim plus interest.

- Although DLH Holdings and Wilkerson Crane Rental accepted and retained the benefit conferred by Monarch Build, the damages awarded for the breach of contract claim adequately covers the unjust enrichment claim.

- Even though DLH Holdings and Wilkerson Crane Rental converted Monarch Build's design drawings for their use, the damages awarded for the breach of contract claim also adequately covers the conversion claim.

- The statute of frauds did not require the agreement of the parties to be in writing because it could have been performed within one year.

- No evidence was presented by the defendants to support their slander of title counterclaim even though they had been advised that they "could reapproach the subject at the time of trial."
- The defendant's breach of contract counterclaim was denied because no credible evidence was presented to establish that Monarch Build delayed the project.
- The defendants shall have joint and several liability for the damages awarded.

On July 28, 2023, the district court entered a "Journal Entry of Judgment" in which it incorporated its oral ruling by reference and summarized its decision. In the journal entry, the district court entered judgment against DLH Holdings and ACIC—jointly and severally—in the amount of $444,522.29, plus additional interest at the contract rate of 12% per year after March 1, 2023. In addition, the district court entered judgment against Wilkerson Crane Rental in the amount of $426,570.43, plus additional interest at the statutory rate of 10% per year after March 1, 2023. The district court also ordered the judgment against Wilkerson Crane Rental to be joint and several with the judgment against DLH Holdings and ACIC.

The district court subsequently entered a journal entry awarding Monarch Build attorney fees and court costs. In the journal entry, the district court entered a judgment against all the defendants—jointly and severally—for court costs in the amount of $6,422.97, plus interest at the statutory rate. It also entered a judgment against DLH Holdings for attorney fees in the amount of $151,678.38, plus interest at the statutory rate. In support of its award of attorney fees, the district court found they "were authorized by the parties' contract . . . ."

Thereafter, the defendants filed a timely notice of appeal.

ANALYSIS

Although the appellants have divided their arguments into 12 issues, several of these issues overlap one another. Before beginning our analysis, it is important to note that the parties do not dispute the existence of a binding agreement. Rather, their primary dispute is over the breadth and scope of their agreement. Specifically, they quarrel about whether their agreement included both the design and construction of the commercial building.

*The Statute of Frauds*

We will first address the appellants' contention that K.S.A. 33-106 required the agreement between the parties to be written and signed. They argue that the design and construction phases of the project could not be completed within one year. In response, Monarch Build argues that it was possible for both the design and construction phases of the project to be completed within one year.

To the extent that this issue involves an interpretation of a statute—including the statute of frauds—our review is unlimited. *Roe v. Phillips County Hospital*, 317 Kan. 1, 5, 522 P.3d 277 (2023). However, whether it was possible for an agreement to be performed within one year is a question of fact, and we apply a substantial competent evidence standard of review. See *Gannon v. State*, 305 Kan. 850, 881, 390 P.3d 461 (2017). Substantial competent evidence is legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *Granados v. Wilson*, 317 Kan. 34, 41, 523 P.3d 501 (2023).

K.S.A. 33-106 provides "[n]o action shall be brought . . . upon any agreement that is not to be performed within the space of one year from the making thereof, unless the agreement . . . shall be in writing and signed by the party to be charged . . . ." The burden

of proof is on the party asserting the statute of frauds—in this case the appellants—as an affirmative defense. *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 59, 643 P.2d 100 (1982). The Kansas Supreme Court has found that K.S.A. 33-106 applies "[o]nly when the terms of the alleged agreement demonstrate that it is impossible in both fact and law for the parties to complete the agreement within one year." *Ed DeWitte Ins. Agency v. Financial Assocs. Midwest*, 308 Kan. 1065, Syl. ¶ 2, 427 P.3d 25 (2018).

"The statute of frauds was enacted to prevent fraud and injustice . . . and courts will, so far as possible, refuse to allow it to be used as a shield to protect fraud and as a means to enable one to take advantage of his own wrong." *Walker v. Ireton*, 221 Kan. 314, 320, 559 P.2d 340 (1977). In the *Augusta Bank* case, our Supreme Court considered the issue of whether K.S.A. 33-106 barred a construction agreement that was not in a writing signed by the parties. In considering this issue, the court found that "'the enforceability of a contract under the one-year provision does not turn on the actual course of subsequent events, nor on the expectations of the parties as to the probabilities. Contracts of uncertain duration are simply excluded.'" 231 Kan. at 59 (citing Restatement [Second] of Contracts § 130, comment a [1981]). As a result, K.S.A. 33-106 applies only to those agreements where performance cannot be completed within one year. 231 Kan. at 60.

Accordingly, the question before us is not whether the project may have extended longer than one year. Rather, the question presented is whether there is substantial competent evidence in the record to support the district court's determination that it was possible for the agreement—when it was reached—to be completed within one year. See *In re Estate of Hargreaves*, 201 Kan. 57, 62, 439 P.2d 378 (1968) (rejecting a statute of frauds defense because "[t]he oral agreement in question here might have been fully performed within a year"); *In re Syngenta AG MIR 162 Corn Litigation*, No. 14-md-2591-JWL, 2021 WL 4124647, at *2 (D. Kan. 2021) (unpublished opinion) ("[I]f

24

performance within a year is theoretically possible, the statute [of frauds] does not apply.").

A review of the record on appeal reveals that Kounkel testified at trial that the entire project—including both design and construction—"could easily have been constructed within a year." This testimony—which the district court found to be credible—was sufficient to support the district court's factual finding. Even so, the record contains additional evidence to support the district court's finding. This evidence includes:

- Monarch Build's "Initial Schedule"—dated September 25, 2019—listed commencement of design work on September 26, 2019, and substantial completion of construction less than a year later on September 2, 2020.
- Monarch Build's "New Project Information Sheet"—dated October 2, 2019—listed duration of the project to be from September 3, 2019, to August 1, 2020.
- DLH Holdings' "Notice of Intent"—dated October 10, 2019—listed an anticipated project start date of October 2019 and a completion date in August 2020.

The appellants point us to conflicting evidence in the record that they suggest supports a different conclusion. But it is not the role of an appellate court to reweigh the evidence or to make credibility determinations. Instead, we are to examine the record to determine if the district court's factual findings were based on substantial competent evidence. *Gannon*, 305 Kan. at 881. Moreover, it was the appellants who had the burden to prove that it was impossible for the contract to be completed within a year's time, but they failed to do so. Consequently, based on our review of the record, we conclude that there was substantial competent evidence presented at trial to support the district court's

determination that K.S.A. 33-106 does not bar the claims asserted by Monarch Build in this case.

*The Scope of the Agreement*

Even though the appellants admit that the parties entered into a binding agreement as to the design portion of the project, they contend that there was no "meeting of the minds" on the construction phase of the project. In their brief, the appellants divide their argument into three issues: (1) whether DLH Holdings accepted the terms of the unsigned A141 design-build agreement; (2) whether there was a "meeting of the minds" on the material terms of an agreement regarding the construction phase of the project; and (3) whether the unsigned agreement was legally binding. Because these issues are intrinsically related, we will address them collectively in this section of our opinion.

Whether the parties have entered into a binding agreement depends on the intent of the parties and is a question of fact. *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012); *Duling v. Mid-American Credit Union*, 63 Kan. App. 2d 428, 435, 530 P.3d 737 (2022). As discussed in the previous section, our role is to examine the record on appeal to determine whether the district court's factual findings are supported by substantial competent evidence. *Price v. Grimes*, 234 Kan. 898, 904, 677 P.2d 969 (1984). Still, to the extent that this issue requires us to interpret or give legal effect to written instruments, our review is unlimited. *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018).

To have a valid agreement, the parties must have a "meeting of the minds" on the material or essential terms. *U.S.D. No. 446*, 295 Kan. at 282. In determining whether there has been a "meeting of the minds," we focus primarily on the objective expression of assent rather than on the subjective intent of each party. *Southwest & Assocs., Inc. v. Steven Enterprises*, 32 Kan. App. 2d 778, 781, 88 P.3d 1246 (2004). Here, the district

court determined—after considering the testimony of the parties and the voluminous exhibits admitted into evidence—that the parties reached a binding agreement on both the design and the construction phases of the project. The district court also determined that the parties had a "meeting of the minds" regarding all the essential elements of their agreement and that these were "evidenced by the A141 design-build contract admitted into evidence at trial as Exhibit 156."

Based on our review of the record on appeal, we find that there is substantial competent evidence to support the district court's findings. This evidence includes, but is not limited to:

- Courtney Kounkel testified that Eric Turner came back from the initial meeting with Diana and Jeff Holt on June 6, 2019, and told her that the parties had agreed to use Monarch Build on the project using a design/build delivery method.

- The next day, Kounkel sent out a company-wide email stating:

  "Wilkerson Crane – This is an exciting win because it was not on our radar. We heard about this project and were awarded the project within a weeks time! This will be a $4M design/build new building project and we have teamed up with h | d Architecture. Construction could start as early as the end of this year."

- In July 2019, Monarch Build hired HD Architecture—an architectural firm—and Renaissance Infrastructure Consulting—an engineering firm—as consultants on the project.

- In an email dated September 23, 2019, from Central Bank to Diana Holt of DLH Holdings and Wilkerson Crane Rental, an employee of the bank confirmed: "As you noted[,] the contractor will be Monarch Construction, who will be finalizing the plans and construction costs."

27

- The customized A141 design-build agreement for the project—which was prepared by Turner—identified Monarch Build as the "Design-Builder" for "Wilkerson Crane Headquarters."
- The customized A141 design-build agreement also identified the following:

  "**§ 1.4.3 The Work.** The term 'Work' means the design, construction and related services required to fulfill the Design-Builder's obligations under the Design-Build Documents, whether completed or partially completed, and includes all labor, materials, equipment and services provided or to be provided by the Design-Builder. The Work may constitute the whole or a part of the Project.

  "**§ 1.4.4 The Project.** The Project is the total design and construction of which the Work performed under the Design-Build Documents may be the whole or a part, and may include design and construction by the Owner and by separate contractors."

- On November 25, 2019, Monarch Build, HD Architecture, and RIC submitted the design drawings for the project—that identified Monarch Build as the "DESIGN/BUILD CONTRACTOR"—to DLH Holdings and Wilkerson Crane Rental.
- On December 6, 2019, DLH Holdings and Wilkerson Crane Rental provided these design drawings—identifying Monarch Build as the "DESIGN/BUILD CONTRACTOR"—to Landmark National Bank in support of their application for a construction loan.
- On January 7, 2020, DLH Holdings and Wilkerson Crane Rental started the application process for a 504 SBA loan from Wakarusa Valley Development, Inc. In connection with this application, Tim Bateman—the CFO of Wilkerson Crane Rental—identified Monarch Build as "the builder" for the project.

28

- Cannon Building Systems was retained by Monarch Build as the supplier of the pre-engineered metal building to be constructed on DLH Holdings' property for the use of Wilkerson Crane Rental.
- On January 13, 2020, Cannon ordered the pre-engineered building from VP Buildings and also ordered a crane from Konecranes to be used for the construction.
- Cannon also issued a subcontract to Lane Iron Work for erecting the pre-engineered metal building.
- On February 11, 2020, Cannon began incurring expenses related to the construction portion of the project.
- On February 24, 2020, HD Architecture completed the set of drawings that were submitted by Monarch Build to the City of Bonner Springs as part of the construction permit application. Those drawings identified Monarch Build as the "DESIGN/BUILD CONTRACTOR."
- On February 28, 2020, Monarch Build uploaded the finalized construction drawings online so that the subcontractors could provide construction bids to Monarch Build for the project. Notably, the bid notice stated: "Wilkerson Crane is a 27,064 SF new building on a green field consisting of office and industrial shop space. MONARCH has been awarded the contract."
- On March 2, 2020, Monarch Build applied for a building permit application to the City of Bonner Springs for the project as the general contractor for the construction phase of the project.
- On March 10, 2020, Monarch Build conferred with the Unified Government Public Health Department about the need for the installation of an onsite wastewater system for the project during construction.
- On March 20, 2020, Monarch Build compiled the "hard costs" from subcontractors for the construction phase and provided DLH Holdings with

an updated total contract amount of $6,502,011 that included both design and construction.

- On April 10, 2020, Monarch Build provided a "final budget" for the design and construction of the building—in the amount of $6,750,418—to DLH Holdings/Wilkerson Crane.

- On April 24, 2020, Turner sent an A141 design-build agreement—showing that an agreement had been reached on October 7, 2019—to Diana Holt of DLH Holdings for the design and construction of the project.

- The A141 design-build agreement included the following:

  - A total contract amount of $6,750,418 that included both design and construction according to the "final budget" attached as an exhibit to the agreement.
  - The scope of work involving both design and construction of the project per the drawings dated April 10, 2020, also attached as an exhibit to the agreement.
  - A schedule for the design and construction portions of the project dated April 22, 2020, and attached as an exhibit to the agreement.

- On April 20, 2020, Michael Strick sent an email to the City that stated:

  "We received Approval on Friday to proceed with the Owner. We will be working on finalizing contracts and getting guys rolling pretty quickly. I've copied Chris Hinkin who will be the Project Manager for Monarch. We've received approval from the UG for the septic system and will be working with our subcontractor to pull that permit to provide you as well. Thanks for all your help!"

30

- At trial, Diana Holt testified that this A141 design-build agreement included both the design work that Monarch Build had already completed, and construction work that Monarch Build was preparing to perform.

- Holt acknowledged in her testimony that she never objected to or requested any modifications to this A141 design-build agreement.

- She testified at trial that after receiving the A141 design-build agreement on April 24, 2020, she forwarded it to her husband, Jeff Holt, and to DLH Holdings' and Wilkerson Crane Rental's CFO, Tim Bateman.

- Monarch Build assigned staff—including a project manager, an on-site superintendent, and a project coordinator—and began including the project in the weekly operations meetings regarding ongoing construction projects.

- Monarch Build also submitted forms and set meetings to establish utilities to the construction site, such as gas service and temporary electrical service.

- Bateman testified by way of deposition that: (1) He could not recall any dispute DLH Holdings and Wilkerson Crane Rental had with Monarch Build over the final budget numbers for design and construction of the project; (2) no other contractors besides Monarch Build were being considered for the construction phase of the project; and (3) he could not recall that he had any concerns about the terms of the finalized A141 design-build agreement provided to DLH Holdings in April 2020.

- At trial, Kounkel testified that by May 1, 2020, the project "was fully in the construction phase."

- On May 4, 2020, Scott Anderson, DLH Holdings' attorney, forwarded a sales tax exemption certificate application for the construction portion of the project that showed a starting date of construction of April 23, 2020, and identified Monarch Build as the "prime contractor" for the construction portion of the project.

31

- The next day, Landmark National Bank emailed Diana Holt that the construction loan had been approved.

- On May 12, 2020, Landmark National Bank issued a formal loan commitment to DLH Holdings and Wilkerson Crane Rental for the construction project.

- Soon thereafter, on May 22, 2020, Wakarusa Valley Development approved the SBA portion of the construction loan subject to the SBA's formal approval.

- The SBA formally approved the construction loan on June 1, 2020.

- Bateman testified in his deposition that throughout the loan approval process, DLH Holdings consistently represented that Monarch Build was going to construct the project.

- Bateman also testified that the plan throughout the project was to use Monarch Build for both the design and construction, but Diana Holt changed her mind sometime before June 2, 2020.

- At trial, Diana Holt was asked about the A141 design-build agreement, and she agreed that "all of the blanks [were] filled in," "all the attachments [were included]," and "it was ready for execution" once the construction loans were approved.

- Turner also testified that the scope, price, and schedule as reflected in the design-build contract in April 2020 were all fully agreed upon by the parties.

Once again, the appellants point us to evidence that supports their position that the parties did not reach a binding agreement as to the construction phases of the project. Although we acknowledge that reasonable fact-finders could have reached different conclusions based on the evidence presented at trial, the question before us is whether the district court's decision was supported by substantial competent evidence. As addressed

above, we find that there is evidence in the record—viewed from an objective perspective—to support the district court's conclusion that the parties reached a binding agreement on both the design and construction phases of the project.

The appellants point to § 4.4.3 of the A141 agreement, which states: "If the Owner and Design-Builder agree on a proposal, the Owner and Design-Builder shall execute the Design-Build Agreement setting forth the terms of their agreement." In addition, the appellants cite §§ 1.4.1, 1.4.2, 1.4.15, and 16.1.2 of the A141 agreement, which also require execution or a signature for modifications. Yet, as we have previously discussed, the lack of a signature on a written instrument does not preclude a legally binding agreement if there is other evidence to reflect the objective intent of the parties. See *Southwest & Assocs.*, 32 Kan. App. 2d 778, Syl. ¶ 2.

A party expressing assent to an offer can create a legally binding agreement even if it believes that the agreement can later be renounced or has a subjective intent not to bind itself to its terms. *Andra v. Peebler Rev. Trust*, No. 106,432, 2012 WL 4937465, at *7 (Kan. App. 2012) (unpublished opinion); see 1 Corbin on Contracts § 4.10 (2018 ed.). In other words, a district court "may ascertain the existence and terms of an agreement from a combination of written instruments and the acts of the parties in connection therewith. [Citation omitted.]" *Reznik v. McKee, Trustee*, 216 Kan. 659, 673, 534 P.2d 243 (1975). These actions may include such things as accepting and acting on the agreement, ratifying the agreement, or accepting performance by the other party. *Lindsey Masonry Co. v. Murray & Sons Construction Co.*, 53 Kan. App. 2d 505, 511, 390 P.3d 56 (2017).

Certainly, a written agreement signed by the parties would have been preferrable and likely would have prevented this lawsuit. Because the parties moved forward without a signed written agreement, it was left to the district court to determine if the parties had agreed only to the design phase of the project or if they had also agreed to the

construction phase of the project. Although the appellants argue that the district court "arbitrarily disregarded the unrebutted testimony of four witnesses and two exhibits that unequivocally confirmed that Diana Holt's intention was solely to hire Monarch for the Design Contract, but not the Construction Contract," we do not find this argument to be supported by the record on appeal.

A review of the record reveals that the district court thoughtfully considered the evidence presented by the parties at trial. In doing so, it found that the testimony of some of the witnesses lacked credibility or was less persuasive than the testimony of other witnesses. Significantly, the district court did not believe the testimony offered by Turner, who left Monarch Build and, shortly thereafter, obtained the construction portion of the project on behalf of his new company.

In reaching its decision, the district court also noted the continued communications between Turner and Jeff Holt during the time period in which he had decided to leave Monarch Build and the time DLH Holdings decided to have a different company construct the commercial building. In addition, many of the documents admitted into evidence at trial as well as the testimony of several of the witnesses could reasonably lead a finder of fact to conclude that the parties had entered into a binding agreement for both the design and construction of the building based on their course of conduct between July 2019 and June 2020.

In summary, we find substantial competent evidence in the record to support the district court's finding that the parties reached a binding agreement for both the design and construction phases of the project. We further find that the record contains substantial competent evidence to support the conclusion that the parties' outward and objective intent was to enter into such an agreement. In accordance with Kansas law, we do not find that a signed written contract was required as a condition precedent to form a legally

binding agreement between the parties. Finally, we reject the appellants' suggestion that the district court's decision was arbitrary and capricious.

*The Amount of Damages*

Next, the appellants contend that the district court erred in the amount of damages it awarded for breach of contract. The correct measure of damages for breach of contract is a question of law subject to unlimited review. *Peterson v. Ferrell*, 302 Kan. 99, 106, 349 P.3d 1269 (2015). While damages awards are discretionary, the record must show "a reasonable basis for computation" of the damages. 302 Kan. at 106. Here, based on our review of the record on appeal, we find the district court's award of damages to be reasonable and based on the evidence presented at trial.

Although damages need not be proven with absolute certainty, there must be at least a reasonable basis to enable a fact-finder to arrive at an approximate sum of damages. 302 Kan. at 106; see *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 395, 266 P.3d 516 (2011). The purpose of awarding damages in a breach of contract case is to make a party whole by restoring it to the position it was in before the injury. *Tillman v. Goodpasture*, 313 Kan. 278, 287, 485 P.3d 656 (2021). The purpose of awarding damages for breach of contract is to put the nonbreaching party in as good of a position as it would have been had the agreement been performed. *Peterson*, 302 Kan. at 106.

Significantly, § 13.1.5 of the A141design-build agreement allowed DLH Holdings to terminate the parties' agreement for convenience and without cause. This section of the A141 design-build agreement also provided a remedy if DLH Holdings desired to get out of the agreement. In particular, this section stated that "[i]n the event of such termination for convenience, the Design-Builder shall be entitled to all compensation due under § 13.2.4.3 below."

35

In turn, § 13.2.4.3 of the A141 design-build agreement provided:

"In case of such termination for the Owner's convenience, the Design-Builder shall be entitled to receive payment for all Work executed through the date of the termination, plus costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed due to the termination, and Design-Builder's entire Fee."

The appellants argue that these provisions of the A141 design-build agreement do not apply because the parties did not agree to anything beyond the design phase of the project. But we have found that there is substantial competent evidence in the record to support the district court's finding that there was a binding agreement reached by the parties that included both the design and construction of the building. Consequently, we do not find that the district court erred in basing its award of damages on the formula set forth in § 13.2.4.3 of the A141 design-build agreement.

The record on appeal also includes Exhibit C to the design-build agreement that sets out a contractor's fee of $309,272. This represents 5% of the total amount due under the terms of the agreement. At trial, Kounkel testified that 5% is a standard amount that would be charged as a markup. Kounkel also testified that she was never advised that the defendants had "any disagreements or objections to that amount." Likewise, Turner testified that "the owner" would have been aware that "there was a fee based upon 5 percent of the construction costs." Accordingly, we conclude that the district court's award of $309,272 in damages is supported by substantial competent evidence in the record.

*The Award of Attorney Fees*

The appellants assert that the district court erred in finding that the agreement of the parties provides for an award of attorney fees. The issue of whether a district court has the authority to award attorney fees is a question of law over which our review is

36

unlimited. *In re Estate of Oroke*, 310 Kan. 305, 317, 445 P.3d 742 (2019). In Kansas, "in the absence of statutory or contractual authorization, each party to the litigation is responsible for paying his or her own attorney fees." *Robinson v. City of Wichita Employees' Retirement Bd. of Trustees*, 291 Kan. 266, 279, 241 P.3d 15 (2010). Here, the district court found "that attorney fees were authorized by the parties' contract and [are] awarded the full amount claimed of $151,678.38 (the net amount not including costs)."

In reaching its decision to award attorney fees, the district court relied on § 14.4.2 of the A141 design-build agreement, which states:

> "The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction. *The arbitrator or arbitrators shall also be empowered to award reasonable attorney fees*, costs and expenses, including expert fees, *to the prevailing party*." (Emphases added.)

However, we cannot disregard the plain language of this section of the agreement that authorizes an award of attorney fees by arbitrators but does not give the same authority to the district court. If Monarch Build had chosen to pursue arbitration to resolve their dispute with the appellants, the "arbitrator or arbitrators" would have been "empowered to award reasonable attorney fees . . . to the prevailing party." But Monarch Build instead chose to file a petition in district court rather than submit the parties' dispute to arbitration. We find nothing in the agreement to authorize a district court to award attorney fees in this case. Although counsel for Monarch Build suggested in oral argument that the district court was also authorized to award attorney fees pursuant to statute, the district court expressly relied upon the "contract" as the basis for its award. Thus, we find that the district court's award of attorney fees should be reversed.

*The Breach of Design Portion of the Agreement*

The appellants also contend that the district court erred in awarding Monarch Build "the unpaid balance due from Invoice no. 8 of $27,494.13 . . . ." They argue that this award was for "extra work" for which DLH Holdings and Wilkerson Crane Rental had not agreed. In response, Monarch Build contends that this invoice was consistent with the parties' agreement and was for "markup on the design and preconstruction portion of the Project."

The record reflects that Monarch Build submitted eight invoices to DLH Holdings for work performed for the design or preconstruction portion of the project. At trial, Kounkel testified that DLH Holdings paid all the invoices except for the last invoice. She explained that the 5% markup reflected in the invoice is a standard amount that would be charged as a markup. Additionally, Turner testified that Monarch Build was entitled to a fee on design and construction. We find nothing in the record to support the appellants' suspicion that there was a clerical error in the agreement or on the invoices.

Monarch Build presented evidence supporting the position that it was entitled to a 5% fee for all the services it performed on the project. On the other hand, the appellants have failed to show that the 5% fee reflected in the last invoice was included on previous invoices. They have also failed to establish that this fee was not applicable to the design portion of the project. As a result, we find that the district court did not err in awarding damages for the balance due on the last invoice sent by Monarch Build to DLH Holdings.

*The Conversion Claim*

The appellants assert that the district court erred in finding that DLH Holdings and Wilkerson Crane Rental converted Monarch Build's property to its own use. In the alternative, they argue that the district court erred in the amount of damages it awarded

for conversion. In response, Monarch Build contends that the district court was correct in finding that it was the owner of the design drawings for the construction of the building and that the appellants had unlawfully converted them without permission.

This issue involves a bifurcated review standard because it involves both the interpretation of written instruments and factual determinations made by the district court regarding the conduct of the parties. As indicated above, we exercise unlimited review over the interpretation and legal effect of written instruments. *Trear*, 308 Kan. at 936. However, we review the district court's factual findings to determine whether they are supported by substantial competent evidence. Finally, our review of the district court's conclusions of law based on those findings is unlimited. See *Gannon*, 305 Kan. at 881.

The district court found that DLH Holdings and Wilkerson Crane Rental unlawfully converted the design drawings owned by Monarch Build when it used those design drawings to have another company construct the building. In its bench ruling, the district court determined: "As to the claim of conversion, the Court finds that DLH/Wilkerson took ownership of the design without legal authorization and therefore converted the design for their use. But the Court finds that it has already awarded the appropriate amount of damages under the breach of contract claim." Similarly, in its journal entry of judgment, the district court ruled that "DLH took ownership of the design without legal authorization and therefore converted the design for its use."

In Kansas, conversion is defined as the "'unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.'" *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 22, 378 P.3d 1090 (2016) (quoting *Bomhoff v. Nelnet Loan Services, Inc.*, 279 Kan. 415, 421, 109 P.3d 1241 [2005]). Generally, the damages for conversion are based on the property's value—at the time it was converted—plus interest. *In re Conservatorship of Huerta*, 273 Kan. 97, 110-11, 41 P.3d 814 (2002). Here, the design drawings for the

building obtained by Monarch Build is the property the district court found to be converted. See *Federal Fire Protection v. J.A. Jones/Tompkins*, 267 F. Supp. 2d 87, 92 (D.D.C. 2003) (conversion claim based on the unauthorized use of construction drawings); *CMLAV v. Mueller*, S.W.2d 741, 743 (Mo. Ct. App. 1995) (conversion claim involving architectural schematic drawings).

Based on the agreement of the parties, Monarch Build owned the design drawings rendered by HD Architecture and Renaissance Infrastructure Consulting. Monarch Build points us to § 12.1 of the A141 design-build agreement, which states that "[t]he Design-Builder, and the Architect, Consultants, Contractors, and any other person or entity providing services or work for any of them, shall be deemed the authors and owners of their respective Instruments of Service, including the Drawings and Specifications." Although Diana Holt testified that she had a "verbal agreement" about the design drawings, she could not identify with whom she allegedly had such an agreement. Perhaps DLH Holdings subjectively assumed that it was the owner of the design drawings, but we find that there is substantial competent evidence to support the district court's ruling that it did not.

On June 23, 2020, Monarch Build's attorney sent a letter to DLH Holdings and Grayson Enterprise expressly stating that his client did not consent to them using the design drawings to construct the building. The letter informed DLH Holdings:

> "[T]he Instruments of Service are owned by Monarch and may only be used for the Project by Monarch or with Monarch's permission and prior written agreement acceptable to Monarch, which has not been provided (and will not be provided to Wilkerson, Grayson or anyone else absent an agreed settlement payment, which has not been made). Wilkerson and Grayson are therefore hereby directed to cease-and-desist from using in any way the Instruments of Service provided by Monarch for this Project. Wilkerson and Grayson are further hereby directed to cease-and-desist from disclosing the contents of the Instruments of Services provided by Monarch for the Project to anyone else. Such

40

> Instruments of Service belong to and are trade secrets of Monarch and must be kept
> strictly confidential by Wilkerson and Grayson."

It appears that the appellants are arguing that the design drawings became the property of DLH Holdings once the project moved from the design phase to the construction phase. But this argument is founded on the appellants' assertion that the parties agreed to have Monarch Build perform only the preconstruction services. As addressed above, the district court found—based on substantial competent evidence in the record—that the parties agreed that Monarch Build would be the contractor for both the design and construction phases of the project.

We conclude that the district court did not err in finding that Monarch Build was the owner of the design drawings for the building under the terms of the parties' agreement. Likewise, we conclude that there is substantial competent evidence in the record to support the district court's finding that DLH Holdings and Wilkerson Crane Rental improperly converted Monarch Build's property when it used the design drawings without permission to have other contractors construct the building. We also note that the district court found there were no additional damages due as a result of the conversion because it had already awarded the appropriate amount of damages under the breach of contract claim. Under these circumstances, we affirm the district court's decision on the conversion claim.

*The Unjust Enrichment Claim*

The appellants further contend that the district court erred in finding that DLH Holdings and Wilkerson Crane Rental were unjustly enriched by using the design drawings owned by Monarch Build without permission to complete construction of the building. The district court determined based on the evidence presented during the bench trial that DLH Holdings benefited as the owner of the real property on which the building

41

was constructed and that Wilkerson Crane Rental benefited because Monarch Build had the building designed to meet its needs for office space as well as storage.

The elements of a claim based on a theory of unjust enrichment are: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Haz-Mat Response, Inc. v. Certified Waste Services Ltd.*, 259 Kan. 166, 177, 910 P.2d 839 (1996); *J.W. Thompson Co. v. Welles Products Corp.*, 243 Kan. 503, 512, 758 P.2d 738 (1988). This issue presents a mixed question of law and fact. The legal conclusion of whether a party can recover damages based on a legal theory of unjust enrichment presents a question of law over which this court exercises unlimited review. *Uhlmann v. Richardson*, 48 Kan. App. 2d 1, 6, 287 P.3d 287 (2012). At the same time, we review the factual findings supporting the district court's legal conclusion under the substantial competent evidence standard. *Gannon*, 305 Kan. at 881.

Similar to their argument related to Monarch Build's conversion claim, the appellants assert that the district court erred because DLH Holdings allegedly paid for the design drawings and, as a result, the appellants were not unjustly enriched. But a review of the record on appeal reflects that DLH Holdings admitted in their pleadings that they had known about and appreciated the benefit conferred by Monarch Build for design and preconstruction services. Moreover, there was substantial competent evidence introduced at trial to support the district court's factual finding that both DLH Holdings and Wilkerson Crane Rental had an appreciation of the benefit conferred by Monarch Build. And there was also evidence introduced at trial to support the district court's finding that the appellants accepted and retained the benefit.

42

After weighing the evidence, the district court determined that the design drawings were prepared by or on behalf of Monarch Build in expectation that it was the contractor for both the design and construction phases of the project. Likewise, as discussed in the previous section of our opinion, there was substantial competent evidence presented at trial that Monarch Build maintained ownership of the design drawings. Finally, we note that DLH Holdings admitted in the pleadings that the reasonable value of the benefit was in excess of $75,000. Because there was substantial competent evidence presented at trial to support each element of unjust enrichment, we do not find that the district court erred in reaching the legal conclusion that both DLH Holdings and Wilkerson Crane Rental were liable to Monarch Build for unjust enrichment.

The appellants appear to want to separate the legal obligations of DLH Holdings from those of Wilkerson Crane Rental. However, a review of the evidence in the record supports the district court's finding that both of these entities benefited from the design-build drawings as well as from the ultimate construction of the building. As such, it was reasonable for the district court to conclude that both DLH Holdings and Wilkerson Crane Rental were unjustly enriched by using Monarch Build's design drawings to have other contractors complete the project.

Once again, we note that the district court did not award any additional damages based on its finding in favor of Monarch Build on its unjust enrichment claim. Instead, the district court found that the damages for the unjust enrichment claim were the same as the damages under the breach of contract claim. In other words, the district court concluded that the damages for unjust enrichment were encompassed in damages for breach of contract, so no further damages needed to be awarded. Thus, we find the district court's decision on unjust enrichment reasonable as it is based on substantial competent evidence and supported by law.

*The Mechanic's Lien*

Although the appellants briefly argue that the district court erred in entering a judgment on the lien replacement bond claim and—in the alternative—challenge the amount of damages it awarded against the bonding company, it was suggested during oral arguments before this court that these issues may be moot. Still, because the issue has been briefed by the parties, we will address it in our opinion. In doing so, we note that because the resolution of this issue involves the interpretation of written instruments as well as statutory law, our review is unlimited. See *Trear*, 308 Kan. at 936.

In *Wagner Interior Supply of Wichita, Inc. v. Dynamic Drywall, Inc.*, 305 Kan. 828, Syl. ¶ 2, 389 P.3d 205 (2017), the Kansas Supreme Court found:

> "The Kansas mechanic's lien law is remedial, providing effective security to anyone furnishing labor, equipment, material, or supplies used or consumed for the improvement of real property under a contract with the owner. The theory behind granting a lien against the property is that the owner of property benefitting from the improvement should be charged with payment for the labor, equipment, material, or supplies used in the improvement."

Under K.S.A. 60-1110, an owner of real property has the option of obtaining a bond to discharge a mechanic's lien filed against its property. When that occurs, "the focus is on the claim, not the statutory lien." 305 Kan. 828, Syl. ¶ 4. To recover on the bond, it must be shown that (1) material and labor were supplied by the claimant; and (2) the material and labor were used in the improvement of the real estate that was the subject of the lien. 305 Kan. 828, Syl. ¶ 4.

Here, Monarch Build filed a mechanic's lien based on the labor and services it performed on DLH Holdings' property under the design-build agreement. In response to the filing of the mechanic's lien by Monarch Build, DLH Holdings, as principal, retained

44

ACIC to issue a bond under K.S.A. 60-1110 "to enable the real property [upon which the building was to be constructed] to be freed from the effect of said claim of lien and any action brought to foreclose said lien." The bond provided that ACIC was bound to Monarch Build in the sum of $342,750.13.

Based on the bond issued by ACIC, the district court entered joint and several judgments against DLH Holdings and the bonding company for the damages awarded as a result of DLH Holdings' breach of contract. These joint and several judgments were entered for $444,522.29 plus 12% interest per year after March 1, 2023. The district court also entered joint and several judgments against DLH Holdings, Wilkerson Crane Rental, and ACIC for an additional $6,422.97 in costs plus interest at 9.25%.

The appellants suggest that the district court erred in entering a judgment against ACIC that was higher than the amount listed on the face of the bond. However, in making this argument, the appellants overlook the plain language of the "RELEASE OF LIEN BOND" which provides that

"the condition of this obligation is such, that if the lien claimant shall be finally adjudged to be entitled to recover upon the claim upon which his lien is based, *the principal or his sureties shall pay to such claimant the amount of his judgment, together with any interest, costs, and other sums which such claimant would be entitled to recover upon the foreclosure of the lien.*" (Emphasis added.)

In light of this language in the bond, we find that the district court appropriately awarded joint and several judgments against DLH Holdings and ACIC for the full amount of the judgment, together with interest and costs.

Additionally, the appellants argue that the judgment against ACIC was improper because the mechanic's lien was filed by Monarch Build against the wrong property. A review of the record shows that the mechanic's lien was filed against the real property

45

located at 14011 Gibbs Road, while the new building was to be constructed on adjacent property located at 14101 Gibbs Road. It is undisputed that both of these lots were owned by DLH Holdings. Moreover, DLH Holdings was in the process of combining them into one lot in September 2020 when the mechanic's lien was filed. Furthermore, the appellants candidly admit that "the two properties are adjacent lots with similar addresses and a common owner, which may cloud what otherwise would be clear and obvious."

Under K.S.A. 60-1102(a)(3), Monarch Build provided a description of the real property subject to the lien. The description included the address of one of the two lots which were eventually combined into one. The mechanic's lien correctly referenced a construction project known as Wilkerson Crane Headquarters on property that was owned by DLH Holdings in Bonner Springs. Considering that the mechanic's lien provisions are liberally construed once the lien has been shown to have attached, we find that the description in the mechanic's lien was sufficient to comply with the statute. See *Holiday Development Co. v. Tobin Construction Co.*, 219 Kan. 701, 704-05, 549 P.2d 1376 (1976); *Lewis v. Wanamaker Baptist Church*, 10 Kan. App. 2d 99, 100, 692 P.2d 397 (1984).

*The Slander of Title Claim*

Furthermore, the appellants contend that the district court erred by dismissing their slander of title claim. Notwithstanding, we find based on our review of the record on appeal that the appellants abandoned or waived this issue before the district court. As a result, we will not consider it on appeal.

As the parties are aware, the district court originally granted partial summary judgment in favor of Monarch Build on the slander of title counterclaim. Yet after reaching this interlocutory decision, the district court reconsidered and ruled that it would allow the appellants to present evidence of slander of title at the bench trial and that it

46

could "request that [the claim] be considered again at the end." Specifically, the district court explained: "I'm not going to bar you from putting that evidence [regarding slander of title] at trial" and reiterated that the appellants "can bring it up at trial." When counsel for the appellants asked if he would also be allowed to present evidence of damages for slander of title, the district court responded: "You'd be allowed to bring it in."

Even though the district court expressly advised the appellants that they could present evidence of slander of title at trial, they did not do so. Nor did they request to proffer any such evidence to the district court during the trial in order to preserve the issue for appeal. Of course, issues not raised or that are abandoned before the district court cannot be raised on appeal. *In re N.E.*, 316 Kan. 391, 407, 516 P.3d 586 (2022). Because the appellants did not present evidence of slander of title—nor did it proffer such evidence to the district court at trial—we find that they have waived or abandoned this claim.

*The Request for Appellate Attorney Fees*

While this appeal was pending, Monarch Build filed a motion requesting that we award appellate attorney fees pursuant to Kansas Supreme Court Rule 7.07(b) (2025 Kan. S. Ct. R. at 52). In support of this request, Monarch Build again asserts that attorney fees are authorized under the agreement. In addition, it asserts that the award of attorney fees is appropriate under the Kansas Fairness in Private Construction Contract Act, K.S.A. 16-1801 et seq.

Under Rule 7.07(b)(1), "[a]n appellate court may award attorney fees for services on appeal in a case in which the district court had authority to award attorney fees." (2025 Kan. S. Ct. R. at 52). For the reasons explained above, we find that the district court lacked authority to award attorney fees under the terms of the agreement. We will now

47

turn to the question of whether the district court had the authority to award attorney fees under the Kansas Fairness in Private Construction Contract Act.

The Act focuses on the "three tiers of responsibility in ordinary construction projects—the owners—the contractors—and the subcontractors." *Drywall Systems, Inc. v. A. Arnold of Kansas City*, 57 Kan. App. 2d 263, 265, 450 P.3d 379 (2019). As to the award of attorney fees, K.S.A. 16-1806 provides:  "In any action to enforce K.S.A. 16-1803, 16-1804 or 16-1805 . . . the court . . . shall award costs and reasonable attorney fees to the prevailing party." So, we must first determine if Monarch Build brought an action to enforce K.S.A. 16-1803, K.S.A. 16-1804, or K.S.A. 16-1805.

K.S.A. 16-1803 addresses contractual provisions that are against public policy and failure to pay those involved in the three tiers of responsibility. Next, K.S.A. 16-1804 addresses the maximum amount of retainage in construction contracts and provides remedies for failure to pay. In turn, K.S.A. 16-1805 addresses the suspension of performance when a contractor or subcontractor is not timely paid.

Based on the plain and unambiguous language of the Kansas Fairness in Private Construction Contract Act, we find that K.S.A. 16-1806 does not apply in this case because Monarch Build sought to recover damages for breach of contract, unjust enrichment, conversion, and under a lien replacement bond. Monarch Build did not bring an action under K.S.A. 16-1803, 16-1804, or 16-1805. Moreover, we must refrain from reading language into a statute that is not readily found in its words. *Schmidt v. Trademark, Inc.*, 315 Kan. 196, 200, 506 P.3d 267 (2022). Consequently, we deny Monarch Build's request for appellate attorney fees.

CONCLUSION

In conclusion, we note that this is a complex case in which the parties were represented by experienced attorneys. We also note that the case was heard by a district court judge who conscientiously weighed the evidence presented at trial before reaching her decision. Moreover, based on our review of the record on appeal, we find that each of the parties received a fair trial. With the exception of the award of attorney fees, we find that none of the issues preserved for appeal would lead us to the conclusion that the district court's judgment should be overturned. Furthermore, we deny Monarch Build's request for appellate attorney fees. We, therefore, affirm the district court's judgment in part and reverse it in part.

Affirmed in part and reversed in part.